[Cite as *In re R.M.A.L.O.*, 2023-Ohio-3695.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of: :

R.M.A.L.O., : No. 22AP-425
(C.P.C. No. 19JU-14187)

(R.O., :

(ACCELERATED CALENDAR)

Appellant). :

---

D E C I S I O N

Rendered on October 10, 2023

---

**On brief:** *Robert D. Essex, Esq.,* for appellant R.O.

**On brief:** *Robert McClaren Esq.,* for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, P.J.

{¶ 1}  Appellant, R.O., appeals from the May 25, 2022 decision and judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating the parental rights of appellant and granting permanent custody of R.M.A.L.O to Franklin County Children Services ("FCCS").  For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2}  On June 18, 2019, appellant gave birth to R.M.A.L.O.  At the time of R.M.A.L.O.'s birth, appellant tested positive for benzodiazepines and THC.  Appellant had a prior history with FCCS dating back to 2017, and FCCS was granted temporary court commitment ("TCC"), of two of R.M.A.L.O.'s siblings on December 21, 2018 in Franklin C.P. No. 18JU-11121.[1]  At the time of R.M.A.L.O.'s birth, appellant had made minimal

---

[1] The court takes judicial notice of all cases relevant to this matter.

progress on case plan objectives in case No. 18JU-11121, including that she was not complying with services offered by Permanent Family Solutions Network ("PFSN"), and had not completed any drug tests.

**{¶ 3}** On June 20, 2019, FCCS filed a complaint in the Franklin County Court of Common Pleas, Domestic Relations, Juvenile Division under Franklin C.P. No. 19JU-7285, alleging that R.M.A.L.O. was an abused, neglected, and dependent child. A preliminary hearing was held on June 21, 2019, and FCCS was awarded a temporary order of custody ("TOC") of R.M.A.L.O.

**{¶ 4}** On September 17, 2019, case No. 19JU-7285 was dismissed by operation of law and was refiled as Franklin C.P. No. 19JU-10781.

**{¶ 5}** On December 12, 2019, case No. 19JU-10781 was dismissed by operation of law and was refiled as Franklin C.P. No. 19JU-14187 (the instant matter). FCCS was again awarded a TOC of R.M.A.L.O.

**{¶ 6}** On March 9, 2020, the case came for trial. R.M.A.L.O. was adjudicated neglected and FCCS was awarded a TCC of R.M.A.L.O. The court also scheduled an annual review hearing for June 17, 2020. At the June 17, 2020 review, the court granted an extension of the TCC for six months to permit appellant more time to make progress on the case plan. The court scheduled the next review hearing for December 9, 2020.

**{¶ 7}** On November 4, 2020, FCCS filed a motion for Permanent Court Commitment ("PCC") of R.M.A.L.O. The case proceeded to trial on April 13, 2022, during which the court heard two days of testimony from three witnesses: appellant, as if on cross-examination; David Rowland, the children's Guardian ad Litem ("GAL"); and Alicia Lannom, the ongoing caseworker from PFSN. The following evidence was adduced at trial.

**{¶ 8}** Appellant testified first and provided the following testimony. Appellant has three children, none of whom lives with her. R.M.A.L.O. has never lived with her. Appellant did not have an understanding as to why the children did not live with her. Appellant was familiar with her case plan, and knew it required her to complete certain services and activities over the previous two years, but she was having difficulty completing the objectives. Appellant testified that her case plan required her to complete parenting classes, a substance abuse assessment and drug testing, domestic violence programming, and mental health services.

{¶ 9}  Appellant testified that she was engaged to K.E., who is the father of her two older children.  She testified that she had been involved in a domestic violence incident with K.E. in 2016, but since then there had been no physical altercations, only arguments.  After FCCS presented a filing for a Civil Protection Order ("CPO") dated November 11, 2017, appellant testified that she did not file it and the signature on the filing was not hers.  She further testified, however, that she had filed a motion for a CPO at some point but that she asked for it to be dismissed.  Appellant testified that many of the allegations in the November 11, 2017 CPO filing were inaccurate, including that K.E. did not push her down; did not smack her face; and did not push her down again.  She also testified that the statement that she had said she was afraid K.E. would become violent again was not true.  Appellant further testified, however, that the statements regarding K.E. not returning her child to her and K.E. breaking a window and punching holes in the walls of appellant's home were accurate.  Appellant testified that she had never participated in any domestic violence services.

{¶ 10}  Appellant provided testimony regarding an incident which occurred on January 28, 2022 at appellant's home during which she and the PFSN caseworker sought shelter in the caseworker's car when K.E. became angry.  Appellant testified that K.E. approached the car and blocked the path of the car and refused to let her leave.  Appellant initially testified that she sought shelter in the caseworker's car out of concern for her personal safety.  She later testified, however, that she "had no concern for my safety that day." (Apr. 13, 2022 Tr. at 68.)

{¶ 11}  Appellant testified that she smokes marijuana, but she has no problem with drug use and using marijuana does not impair her in any way.  Appellant further testified that if she were to complete a drug screen that day, she would "probably test positive for marijuana." *Id.* at 73.  She testified she completed a substance abuse assessment and participated in drug and alcohol classes but was not referred for further services after that. Appellant used marijuana after she completed the program.

{¶ 12}  Appellant testified that she recalled calling 9-1-1 on December 3, 2021 to report that K.E., who was at her home, had lost consciousness and was not breathing.  She denied telling the dispatcher that K.E. had used cocaine that day but testified that she told

the dispatcher that he does use cocaine on occasion. Appellant testified that she does not think K.E. has a problem with drugs and that he does not do drugs anymore.

{¶ 13} Appellant testified that she was currently engaged in counseling for mental health through Syntero. She stated she sometimes goes twice a week, and sometimes goes every two weeks. The issues she is working on include domestic violence, coping skills, mental health, and everything that is on her case plan.

{¶ 14} Appellant testified that she struggled with homelessness throughout her entire pregnancy with R.M.A.L.O and in 2016. She stated she is currently living alone in an apartment with subsidized rent and pays $50 per month for rent and utilities. Appellant testified that K.E. lives with his parents, but that if R.M.A.L.O were returned to her, she would use K.E. as a caregiver. Appellant testified she had no concern with K.E. providing care for R.M.A.L.O. in terms of safety.

{¶ 15} Appellant testified that she is not currently employed. She had no monthly expenses besides her rent. Appellant stated she also received SNAP benefits.

{¶ 16} Finally, appellant testified that she does not know whether R.M.A.L.O. has a regular pediatrician. She testified she does not know whether R.M.A.L.O. is prescribed any medication or whether she has any allergies. She stated she did not know when the last medical appointment for R.M.A.L.O. was, and she does not "get any type of information on my child, no updates or anything." *Id.* at 94.

{¶ 17} The GAL testified next and he provided the following testimony. David Rowland was appointed as GAL for R.M.A.L.O. at the first hearing on her case. He is also the GAL for appellant's other two children. Rowland testified that K.E. considers himself to be the father of R.M.A.L.O. and that Rowland expected K.E. to be in the lives of appellant and all of the children were they to reunify.

{¶ 18} Rowland testified that he has seen appellant and K.E. argue but has not observed anything physical. He testified that he had seen appellant roughly a dozen times since the birth of R.M.A.L.O. and had not seen any physical evidence of domestic violence. He further testified that he did not believe the January 28, 2022 incident when appellant and the caseworker took shelter from K.E. in the caseworker's car would be considered domestic violence.

{¶ 19} Rowland testified that he believed that anger management sessions had helped both K.E. and appellant, and that he wrote in his report that appellant had exhibited improvement with her anger issues and gets along very well with K.E. Rowland also testified that he stated in his report that appellant and K.E. attribute "recent episodes of hostility between the parents to the stress on [K.E.] imposed by the Agency for continuing to oppose reunification." *Id.* at 124. Rowland explained that he was not blaming the Agency by stating this, but that "they feel pressure. They believe the Agency is against them and that is causing their anger; that's what I'm saying there." *Id.*

{¶ 20} Rowland testified that he had visited R.M.A.L.O. at her foster home on two occasions. He stated she was very well cared for and was bonded with her foster mother. Rowland further testified that he had observed R.M.A.L.O. and appellant together at visits about four times and believes them to be bonded as well. Rowland testified that R.M.A.L.O. was too young to understand what permanent custody means and she is not old enough to express her wishes directly.

{¶ 21} Finally, Rowland testified that his recommendation was that the court deny FCCS' motion for permanent custody, terminate FCCS' TCC, and return R.M.A.L.O. to appellant under protective supervision of FCCS. Rowland testified it was his belief that returning R.M.A.L.O. to the family would motivate appellant and K.E. to work on their case plan. He further testified that both appellant and K.E. should continue their counseling. Rowland testified that it was his belief that in weighing the best interest factors, they did not weigh enough in favor of permanent custody.

{¶ 22} Following the testimony of the GAL, FCCS called child welfare caseworker Alicia Lannom to testify. Lannom stated she is a child protective specialist employed by PFSN, a managed care provider for FCCS. Lannom testified the family had been involved with PFSN prior to the birth of R.M.A.L.O and the case was transferred to Lannom in April 2019. After R.M.A.L.O. was adjudicated to be a neglected child on March 9, 2020, Lannom prepared a case plan, the goal of which was reunification.

{¶ 23} Lannom testified that she had spoken with R.M.A.L.O.'s biological father, D.W., at a supervised visit between him, appellant, and R.M.A.L.O. in January 2021. She stated she and D.W. had planned to meet in the future to discuss the case plan and what his

involvement would be towards reunification; however, he did not make himself available thereafter.

{¶ 24} Lannom testified regarding the objectives of the case plan for appellant, which included to maintain housing and provide proof of income or employment, complete an alcohol and drug ("AOD") assessment, and follow through with any recommendations, attend random drug screens, complete a domestic violence assessment and follow recommendations, complete a mental health assessment and follow recommendations, complete parenting classes, and show ability to provide for R.M.A.L.O.'s needs.

{¶ 25} Lannom testified that she spoke with appellant about the case plan every time they met. Lannom testified that in general, appellant had maintained monthly contact with her, but there had been times periodically when Lannom had not been able to schedule a meeting.

{¶ 26} Lannom testified that domestic violence counseling was included in the case plan due to concerns between appellant and K.E. She testified this was "essentially the reason that the case opened through FCCS." *Id*. at 205. Lannom made several referrals to various providers for appellant to complete a domestic violence assessment which were not followed through on by appellant.

{¶ 27} Lannom testified that she had observed "a handful" of verbal altercations between appellant and K.E. that she felt could have escalated to further violence had she not been present. *Id*. at 216. Lannom testified about an altercation between appellant and K.E. that took place during the summer of 2019 in the FCCS parking lot after a supervised visit. She stated that the police were called in response to that incident. Lannom also testified about another incident that occurred on January 28, 2022 after a home visit. Lannom stated that appellant and K.E. had been fighting verbally and then things escalated to them pushing each other. Lannom testified that K.E. had begun to become destructive to property inside the house. K.E. had taken the microwave off the wall; he had opened the washing machine, taken out appellant's wet clothes and thrown them on the floor, and then ripped the washing machine out of the wall. He also ripped the dryer out of the wall. Lannom became concerned for her own safety, but also felt it was not appropriate for her to leave her client in the situation. At that point she and appellant sought protection from K.E. in Lannom's car. K.E. came outside and continued to attempt to talk to and argue with

appellant through the car window. When Lannom attempted to move the car away to remove herself and appellant further from the situation, K.E. stood in front of the car to prevent them from leaving. At that point Lannom contacted the police. Lannom testified that appellant stated she was tired of living this way and wanted to file for a CPO and plans were made to do that the following Monday morning. When Lannom contacted appellant on the following Monday morning, appellant told her she no long wanted to file for a CPO and K.E. "was back in her home." *Id.* at 225.

{¶ 28} Lannom further testified that there had been many occasions where K.E. had "aggressive reactions and situations," and that "as recently as this Monday our visitation monitor had to end their visit at the Agency early because they were arguing and had been asked multiple times to refrain from doing so during the visit with [R.M.A.L.O.]." *Id.* at 226-27.) Lannom testified that as of the date of the trial, appellant had never completed a domestic violence assessment. She further testified that she would have concerns for R.M.A.L.O.'s physical safety if she were placed in appellant's home.

{¶ 29} On the second day of trial, Lannom continued her testimony. Lannom testified that appellant had completed parenting education that was included in the case plan. Lannom further testified that she had observed between 20 and 30 visits between appellant and R.M.A.L.O. and that she had no concerns. She testified she believed R.M.A.L.O. was bonded to appellant, and she recognized her as her mother.

{¶ 30} Lannom testified that a mental health assessment was also part of the case plan, which had not been completed but was ongoing.

{¶ 31} Lannom testified that a substance abuse assessment and urine screens were required as part of the case plan due to initial reports of substance use and ongoing concerns of substance use. Lannom stated that appellant had been inconsistent in completing her drug screens. Specifically, Lannom testified that as of the date of trial, appellant would have been scheduled for 30 random drug screens and she completed none. For the years 2020 and 2021, appellant was scheduled for approximately 100 total random drug screens each year and she completed 6 to 8 each year. When Lannom discussed with appellant why she was missing so many screens, appellant sometimes indicated transportation was a barrier despite that the Agency has always provided bus passes for appellant to attend the drug screens. Lannom testified that recently, appellant had also

"stated that she did not feel it was that important to complete the drug screens." (Apr. 14, 2022 Tr. at 22.) The screens which were completed by appellant showed appellant tested positive for marijuana.

{¶ 32} Lannom next testified that appellant had stable housing and the home was appropriate. Regarding appellant's finances, Lannom testified that appellant has not reported any income, was consistently unemployed, and had once asked for assistance in paying rent. Lannom testified that appellant and K.E. assist each other financially when one or the other needs money.

{¶ 33} Lannom testified that K.E. was also on the case plan and his objectives were similar to those of appellant. She stated K.E. was referred for urine screens but did not complete any. This was a concern for her given the reported overdose at appellant's home. Lannom also referred K.E. for a domestic violence assessment, and although he made an intake appointment he did not show up for it. Lannom testified that to her knowledge, K.E. had never completed a domestic violence assessment.

{¶ 34} Lannom further testified that K.E. has not readily made himself available to discuss the case plan and never expressed a willingness to complete the case plan, specifically including drug screens. He did complete parenting education in the fall of 2019. Lannom testified that K.E. did have a criminal record.

{¶ 35} Lannom testified that she would not recommend R.M.A.L.O. or her siblings to be placed back into the care of appellant. She stated that although two relatives had come forward to request placement of R.M.A.L.O., neither had passed the requisite home studies. Lannom also stated that the maternal grandmother was interested in custody but had never attended any visits with R.M.A.L.O. and only requested an unsupervised visit once, in the week immediately prior to the trial. No motion for legal custody has been filed by anyone, including the maternal grandmother.

{¶ 36} Lannom testified that R.M.A.L.O. is placed in a foster home and has been there her entire life. Lannom stated she visits R.M.A.L.O. in the foster home monthly. Lannom has never observed anything of any concern in the home. Lannom testified that she believes that R.M.A.L.O. is bonded to both her foster mother and foster father. She testified that R.M.A.L.O. looks to her foster mother for comfort and for her needs, and also has a close relationship with her foster father. Lannom also testified that R.M.A.L.O. is

more talkative and more active in playing at her foster home when compared to her behavior at visits between appellant, K.E., and R.M.A.L.O. Finally, Lannom recommended that the court grant permanent custody to the agency for purposes of adoption.

{¶ 37} Following the trial, on May 25, 2022, the trial court issued a Judgment Entry sustaining FCCS' motion for permanent custody and divesting appellant and the alleged father of R.M.A.L.O., D.W., of their parental rights. (May 25, 2022 Decision & Jgmt. Entry.) The trial court considered each of the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in R.M.A.L.O.'s best interest to grant the motion for permanent custody.

{¶ 38} This timely appeal followed.

## II. Assignment of Error

{¶ 39} R.O. assigns the following error for our review:

> The trial court committed reversible error by terminating the appellant-mother's parental rights when the decision was against the manifest weight of the evidence.

## III. Standard of Review

{¶ 40} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 14. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, an appellate court " 'will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413, 1996 Ohio App. LEXIS 4805 *9 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992). Further, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *Id.*, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and

judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## IV.  Discussion

{¶ 41}  In appellant's sole assignment of error, she asserts the trial court's decision terminating her parental rights must be reversed as being against the manifest weight of the evidence. We disagree.

{¶ 42}  "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  The Supreme Court of Ohio likewise has recognized the essential and basic right of a parent to raise his or her child.  *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, and *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).  In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child.  *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 43}  R.C. 2151.413 permissively allows a public agency to file a motion requesting permanent custody of a child under certain circumstances.  When the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, though, the agency *must* file for permanent custody. R.C. 2151.413(D)(1).

{¶ 44}  R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines "by clear and convincing evidence, that '(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child.' " *In re E.B.* at ¶ 22, quoting *K.M.* at ¶ 14.  Clear and convincing evidence means evidence that creates a firm belief or conviction as to the facts sought to be established.  *In re E.B.* at ¶ 22, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42; *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

"It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *Id.* at ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply." *Id.* Second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.*

{¶ 45} Relevant to this appeal, R.C. 2151.414(B)(1)(d) provides the following circumstances under which FCCS can move for permanent custody:

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period.

{¶ 46} In this case, the trial court found that R.M.A.L.O. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Appellant does not dispute that the first part of the permanent custody analysis is met under R.C. 2151.414(B)(1)(d) and that FCCS need not provide any additional evidence as to the first part of the permanent custody test. Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established by clear and convincing evidence.

{¶ 47} Next, in determining the best interest of a child, R.C. 2151.414(D)(1)(a) through (e) sets forth the relevant factors that the court must consider in determining what is in the best interests of the child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater relevance than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 48} In this case, the evidence at trial overwhelmingly supported the trial court's conclusion that granting permanent custody to FCCS was in R.M.A.L.O.'s best interest, and the trial court thoroughly explained its reasoning as it pertained to the relevant factors in this case in its May 25, 2022 judgment entry. (May 25, 2022 Decision & Jgmt. Entry at 8-16.) We discuss each of these factors in turn.

{¶ 49} Under R.C. 2151.414(D)(1)(a), the trial court was required to consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Here, the trial court acknowledged the testimony of both the GAL and the caseworker who both opined that R.M.A.L.O. was bonded with appellant and recognized appellant as her mother. The evidence showed and the trial court noted that the supervised visits between R.M.A.L.O., appellant, and K.E. went well and that appellant was attentive to R.M.A.L.O. and her other two children during the supervised visits.

{¶ 50} The trial court also found that the testimony of both the GAL and the caseworker showed that R.M.A.L.O. "is very bonded to her foster parents in a comfortable home which has been the only home she has lived in since her birth." (May 25, 2022 Jgmt. Entry at 9.) The trial court found that the evidence showed that R.M.A.L.O. looks to her foster mother for comfort and for her needs, and also has a close relationship with her foster father. The trial court further observed the caseworker testified that R.M.A.L.O. was more talkative and more actively engaged in play at the foster home than she was at visits with appellant and K.E. The evidence in the form of the testimony from the caseworker and the GAL readily supported all of these findings and supports a conclusion that R.M.A.L.O.'s relationship with her foster parents is stronger than her relationship with appellant. Therefore, the "interaction and relationship" factor weighed in favor of awarding permanent custody to FCCS.

{¶ 51} Next, R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, expressed either directly by the child or through the child's GAL. In this case, as set forth above, the GAL testified that R.M.A.L.O. was too young to understand what permanent custody means and she is not old enough to express her wishes directly, and this testimony was not disputed. In its judgment entry, the trial court acknowledged this testimony, finding that R.M.A.L.O. "is too young and immature to express her wishes or understand the concepts of permanency or adoption." (May 25, 2022 Jgmt. Entry at 10.) Thus, this factor neither weighs in favor of nor against the trial court granting permanent custody to FCCS.

{¶ 52} Turning to the next factor, R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the child. Here, it is undisputed, and the trial court found that R.M.A.L.O. who was just under three years old had never lived with appellant because R.M.A.L.O. was removed directly from the hospital following her birth. It is also undisputed, and the trial court further determined that since the time of R.M.A.L.O.'s removal she has remained placed in foster care. Finally, the trial court found that the children had been in the temporary custody of FCCS for more than 12 months in a consecutive 22-month period. The foregoing findings are fully supported by the evidence and this factor weighs in favor of awarding permanent custody to FCCS.

{¶ 53} Next, R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure permanent placement and required the court to consider whether this could be achieved without a grant of permanent custody to FCCS. Here, the trial court determined that R.M.A.L.O. was "in great need of a secure permanent placement to continue her development physically, educationally, emotionally and socially, which cannot be achieved without a grant of permanent custody" to FCCS. (May 25, 2022 Decision & Jgmt. Entry at 15.) The trial court based its determination on its finding that appellant had not substantially remedied the causes for removal of R.M.A.L.O. and that no potential relatives were available for placement or custody of R.M.A.L.O. More specifically, the trial court enumerated its myriad concerns, including that appellant had testified that she is not employed, has no income, and has no knowledge of R.M.A.L.O.'s medical history and medical needs. The trial court also recounted appellant's testimony that she does not have a substance abuse issue yet admitted she smokes marijuana "and can't or will not say how

often." (May 25, 2022 Decision & Jgmt. Entry at 11.) The trial court further expressed concern that appellant admits she does not plan to stop smoking marijuana, failed to follow through on the recommendations arising from her AOD assessment, and failed to consistently submit to random drug screens, all of which is supported by the record.

{¶ 54} The trial court also observed that although appellant did complete a mental health assessment, she never completed therapy nor submitted proof of completing any program. The trial court further noted that while appellant cited transportation problems as part of the reason for her inconsistent participation in counseling sessions, the evidence showed that bus passes had been consistently provided to appellant for her use to get to appointments.

{¶ 55} The trial court was particularly concerned about the ongoing issue of domestic violence, finding that appellant "has continuously refused to assess for domestic violence" and now denies the facts pertaining to domestic violence alleged in the complaint. (May 25, 2022 Decision & Jgmt. Entry at 12.) The trial court recounted in detail the various episodes of domestic violence between appellant and K.E., testified to by both appellant and the caseworker as previously set forth above, and noted that "[t]here is no dispute that [appellant] and [K.E.] had and have anger management issues" and that appellant plans to continue her relationship with K.E. *Id.* The trial court discounted the testimony of the GAL that appellant and K.E. had made progress on their anger issues with each other and that "any relapses in drug issues and anger issues and failures to complete plan objectives to the stress and frustration of each with the agency and the court system." *Id.* at 13. Specifically, the trial court stated:

> The Court finds several problems with this: the severe anger issues and unsafe and unhealthy relationship between [appellant] and K.E. has not changed; both are unwilling to change their dependency on drugs; and both are unable to support and provide [R.M.A.L.O.] with a home that is loving and safe.

*Id.* The trial court specifically observed that the most recent incident of concern took place at appellant's home in late January 2022 during which K.E. was "exerting coercive control over [appellant] in her home" and refused to leave unless and until appellant "gave him the $10.00 she had promised him." *Id.* at 14. The trial court noted that K.E. had also engaged in the destruction of property at appellant's home during this incident and pointed out that

"[t]his aggressive behavior occurred a few months before trial at the home to which the guardian recommends the Court return [R.M.A.L.O.]" *Id.*

{¶ 56} The trial court also pointed out that despite the undisputed evidence showing there are serious anger management issues on the part of both appellant and K.E., appellant plans to continue her relationship with K.E. *Id.* at 12. Indeed, as set forth above, appellant testified that were R.M.A.L.O. to be returned to her, she would use K.E. as a caregiver for the child. Yet, as the testimony of the caseworker shows, other than completing parenting classes in 2019, K.E. has not completed any other objectives required by his case plan, including his refusal to complete a domestic violence assessment.

{¶ 57} Notwithstanding the foregoing, appellant asserts that she has completed substantial portions of her case plan and argues that in any event, non-completion of a case plan is not necessarily grounds for a grant of permanent custody. We readily acknowledge this to be true. *See, e.g., Brooks*, 2004-Ohio-3887 at ¶ 62-63 (finding that consideration of compliance with the case plan, if found relevant by the trial court, is simply one aspect to consider in determining whether it is in the child's best interest to grant or deny the agency's motion for permanent custody). But here, the trial court did not base its determination to grant FCCS' motion for permanent custody merely on the fact that appellant had not fully completed her case plan objectives. Rather, as discussed at length above, the trial court found that, case plan compliance or not, appellant had failed to remedy the conditions leading to R.M.A.L.O.'s removal from appellant's home.

{¶ 58} The findings of the trial court relevant to this factor are all supported by competent, credible evidence in the record. Therefore, credible evidence in the record supported the trial court's conclusions that appellant was unable to meet the basic needs of R.M.A.L.O., that R.M.A.L.O. needs a legally secure permanent placement as required by statute, and that such a placement cannot be achieved without a grant of permanent custody to FCCS. Thus, the factor set forth in R.C. 2151.414(D)(1)(d) weighs in favor of awarding permanent custody to FCCS.

{¶ 59} Finally, under R.C. 2151.414(D)(1)(e), the trial court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11). The trial court found that (E)(10) applies and that the alleged biological father of R.M.A.L.O. has abandoned her, and the evidence in the record supports this finding.

{¶ 60} In sum, the record demonstrates that the trial court properly reviewed and weighed the evidence pertaining to all factors relevant to determining whether granting permanent custody to FCCS was in R.M.A.L.O.'s best interest. Upon our review of all of the evidence presented at trial in this case, we determine that there is competent and credible evidence to support the trial court's conclusion that a PCC is in R.M.A.L.O.'s best interest and in accordance with the law. The trial court's decision is not against the manifest weight of evidence, and appellant's assignment of error is overruled.

{¶ 61} Accordingly, based on all the foregoing, we overrule the sole assignment of error presented by appellant R.O., and we affirm the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody of R.M.A.L.O. to FCCS.

*Judgment affirmed.*

DORRIAN and JAMISON, JJ., concur.