[Cite as *In re T.W.*, 2020-Ohio-4712.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the matter of:  T.W.,                                :

(F.N.,                                                          :

     (Defendant-Appellant).         :

No. 19AP-700
(C.P.C. No. 16JU-015184)

:                    (REGULAR CALENDAR)

---

D E C I S I O N

Rendered on September 30, 2020

---

**On brief:** *Yeura R. Venters*, Public Defender, and *Ian J. Jones*, for appellant.

**On brief:** *Sharon K. Carney,* for appellee Franklin County Children Services.

**On brief:** *William T. Cramer,* for appellee T.W.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant-mother F.N. appeals the October 8, 2019 order of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting the motion by appellee Franklin County Children Services (hereinafter "FCCS") for permanent custody of her son, the minor T.W.

{¶ 2} T.W. has been in the custody of FCCS since December 21, 2016. (Dec. 21, 2016 Compl. at 4). F.N. is an immigrant from Africa and she has resided in the U.S. for 16 years. The whereabouts of T.W.'s father C.T. are unknown. The original dependency complaint alleged that FCCS had opened a case because of T.W.'s extreme behaviors at school,

No. 19AP-700

including flipping desks, throwing chairs, crayons, and scissors, kicking teachers and students, and harming other students. T.W. had been diagnosed with ADHD, ODD, disruptive disorder NOS, and a conduct disorder. F.N. refused to consent to an I.E.P. investigation for T.W., refused to medicate T.W. for his diagnosed disorders, and refused to have T.W. further evaluated by his school.

{¶ 3} Based upon concerns that T.W. was being left at home alone, police were dispatched to the home for a wellness check on December 20, 2016. T.W., who was at the time 6 years old, was found at home alone. He reported that F.N. was at work. The home was found to be messy without clear pathways and lacking in food, and the stovetop was burning bright red and unattended. F.N. arrived at home while the police and a FCCS worker were present and claimed that she had been grocery shopping, although she had no groceries with her. T.W. was taken into emergency custody and a dependency complaint was filed.

{¶ 4} T.W. had difficulty in several different foster placements and, at a continuance hearing on February 28, 2017, T.W.'s guardian ad litem reported that he was already in his third placement at the Hannah Neil Children's Center. On March 17, 2017, the parties agreed to a finding that T.W. was in a state of dependency and a grant of temporary custody to FCCS. A case plan was adopted that included a requirement that F.N. would "comply with any other assessments that are deemed necessary * * *." (Mar. 17, 2017, Tr. at 7). T.W. was at the Hannah Neil Children's Center until May 29, 2017, when he was placed in a treatment foster home in Hamilton County, Ohio. He has remained in this home ever since.

{¶ 5} On August 2, 2017, the managed care provider National Youth Advocate Program (hereinafter "NYAP") filed a motion to be made a party to the action, to modify

No. 19AP-700

the case plan to require F.N. to complete parenting and mental health assessments, and to require F.N. to follow any recommendations of those assessments. That motion was granted and the case plan was amended to include those requirements on November 21, 2017. In her annual report to the court in December 2017, T.W.'s guardian ad litem recommended that he be transitioned to a foster home in Columbus, but also stated that she "does not believe Mother has any difficulties with comprehending case plan objectives – she simply does not agree that her child should be in placement." (Dec. 18, 2017 Guardian ad Litem Report to the Court at 3). F.N. refused to complete a mental health assessment.

{¶ 6} NYAP and FCCS subsequently requested that visits be suspended, based on misconduct at visits by F.N. The caseworker described the incidents as follows:

> [T]his past Monday, the child did refuse to come to the visit. I spoke to the child myself. I tried to explain this to [F.N.] and she became extremely upset. She grabbed my bag off of - - like I was wearing it around my neck, she grabbed that and then I tried to leave stating that the visit is cancelled due to the child not wanting to come and she would not let me leave. We ended up having to call police to escort me out of the building.

(Dec. 7, 2018 Tr. at 5-6). As a result of this incident, the magistrate granted the motion and suspended in-person visits. *Id.* The magistrate also appointed an attorney for T.W., as the guardian ad litem was "not in agreement with [T.W.] returning home and he has indicated that he loves his mother and he wants to go home." *Id.* at 3.

{¶ 7} F.N. consistently refused to participate in the case plan or accept that her actions were at all responsible for T.W. not being returned to her custody. The guardian ad litem's report, filed December 6, 2018, states that she "has not had a meaningful conversation with [F.N.] since March of this year. Each court interaction with [F.N.] since March 2018 (June 2018, July 2018 and October 2018) [F.N.'s] behavior has declined. She repeatedly states that she is [T.W.'s] Mother and that as a result she should have custody.

No. 19AP-700

She has repeatedly refused to take a psychological assessment. When this writer attempts to speak to her she refuses and instead calls this writer names for not recommending that her son be returned." (Dec. 6, 2018 Guardian Ad Litem Report at 4).

{¶ 8} At the trial on the FCCS motion for permanent custody, the evidence demonstrated that despite the fact that a mental health assessment was made an order of the case plan "due to mother's erratic behaviors when engaging with the Agency on multiple occasions," (May 14, 2018 Tr. at 30,testimony of caseworker K.H.), and despite at least 10 separate referrals and discussions with several different NYAP personnel about this issue, F.N. did not complete a mental health assessment. *Id.* at 75-78. Further, while she initially linked with the NYAP parenting program after an assessment it was observed that F.N. did not make any progress in the classes in which she did participate, and also that she refused to participate in any additional classes after August 13, 2018. *Id.* at 31-32. F.N. also refused to allow the caseworker into her home on several occasions. The record showed that the court had suspended F.N.'s visits with T.W. on December 7, 2018, and that visits were not resumed at any point prior to trial. *Id.* at 32-33. The caseworker testified that some of the visits between T.W. and F.N. were positive, that there were no safety issues at F.N.'s home the last time she was permitted to visit it, and also that F.N. did not miss any visits. But the caseworker also stated that the case had never reached a point where unsupervised visits or overnight visits were seriously considered.

{¶ 9} On March 15, 2018, the guardian ad litem filed an updated report, recommending that T.W. remain in the Cincinnati foster home, as "his behaviors just improved dramatically," but recommended weekend visits in both Cincinnati and Columbus. (July 16, 2019, Tr. at 15; *See also* FCCS Ex. 10). The guardian filed another update for the June 12, 2018 annual review, and reported that T.W. was "thriving" in his

No. 19AP-700

foster home and was "doing well in school to the point where his foster mom wanted to enroll him in a different school because he's actually academically gifted." (July 16, 2019, Tr. at 17-18; *See also* FCCS Ex. 11). By the time of the report, the guardian filed for a case review on December 6, 2018, she was recommending that visits and phone calls be suspended as a result of F.N.'s behavior, "until she complies with the Court order for the psychological." (July 16, 2019, Tr. at 21-22; *See also* FCCS Ex. 12.) The guardian ad litem's final report, dated May 9, 2019, recommended that the agency's permanent custody motion be granted. (July 16, 2019, Tr. at 23-24; *See also* FCCS Ex. 13). And at the close of the agency's case, T.W.'s attorney indicated that T.W. himself did not want to return to the custody of F.N.

{¶ 10} F.N. admitted on cross-examination that she did not pass the parenting assessment at the completion of her classes; she stated "I'm a mother, I don't have to pass anything to be a mother to my child." *Id.* at 94-95. And when she was asked why she would not complete a mental health assessment, F.N. answered as follows:

> No, I'm not gonna (sic) do it * * * . Because it doesn't help me, it does not help my child * * * . I'm okay, I have never killed anybody where I was born, and I have never killed anybody here in the United States. I've never hurt anybody and see the blood coming from anybody or any animal. I don't intend to do that ever. I never have that -- if -- I've -- I never think of it once. Though one of these days in the courts, the -- the Guardian did -- I don't know where she take it from, that I say to the Guardian -- the -- the -- the -- the foster that I wanted to kill my -- me and my child because we're gonna (sic) die together.

(Aug. 28, 2019, Tr. at 45.) The trial court addressed the issue with F.N. as follows:

> [TRIAL JUDGE]: [F.N.], you say it is not in your best interest or your child's best interest for you to do the mental health assessment. Why do you feel it's not in your best interest when that is the only thing standing between you and [T.W.] coming home? * * * [I]t's a Court order and if you had followed the

No. 19AP-700

> Court order your child probably would have been home with you by now.
>
> * * *
>
> [F.N.]: Because I know that I'm okay.
>
> [TRIAL JUDGE]: Yeah, but that's not the issue. The issue is you have a Court order. I asked you to do it, you told me no. You were asked to do it by the Magistrate, you were ordered -- you're actually ordered to do it. These are not a request. You were ordered to do it. And you didn't do it. So we sit here today, your child is out of your care for more than 22 months with a possibility that he never be returned to you because you refuse to do this one thing. So why would you not follow the Court order? And as you sit here today you just testified you would not do it today, knowing that it stands between you and your child coming home. Okay, that's my only question. She's refusing to answer. The record will reflect that she refused to answer the question. You may step down.

*Id.* at 60-63.

{¶ 11} On October 8, 2019, the court issued a written decision and granted the motion for permanent custody. The court concluded that T.W. had been in the custody of FCCS for 12 of the preceding 22 consecutive months, and that a grant of permanent custody was in T.W.'s best interest. F.N. appealed, and asserts a single assignment of error—that "[t]he trial court committed reversible error by terminating the appellant-mother's parental rights when the court failed to properly analyze the factors in R.C. 2151.414(D) and the decision was against the manifest weight of the evidence."

{¶ 12} R.C. 2151.413 authorizes a public children services agency to file a motion requesting permanent custody of a child for which it has temporary custody, and when the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, the agency is required to file a permanent custody motion. R.C. 2151.413(D)(1), cited in *In re J.W.*, 10th Dist. No. 19AP-122, 2019-Ohio-4775, ¶ 23. And

No. 19AP-700

R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14. Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply," and second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.* at ¶ 18-20.

The evidence in this case is undisputed that at the commencement of trial T.W. had been in the custody of FCCS for more than 12 out of 22 consecutive months, and in fact had been in FCCS custody for approximately 26 consecutive months. R.C. 2151.414(B)(1)(d). Accordingly, the only issue for the trial court to decide was whether there was clear and convincing evidence that an award of permanent custody was in T.W.'s best interest. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant considerations that the court must weigh in determining whether an award of permanent custody is in the best interests of a child, all of which are of equal importance.

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for

> twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

*Id., cited in In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. The trial court must weigh the evidence presented under the aforementioned factors that evidence using a clear and convincing standard. "Clear and convincing evidence" is "more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.* at ¶ 14, *citing Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Rather, it means evidence that produces a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, *citing Cross* at paragraph three of the syllabus. And while this court has consistently held that "[a] trial court is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision * * * [t]here must be some indication on the record that all of the necessary factors were considered." (Citations omitted.) *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 53.

{¶ 13} Unfortunately, in this case the trial court's judgment entry is insufficient and does not permit this court to conclude that the trial court considered all of the R.C. 2151.414(D) factors. In its findings of fact and conclusions of law, the trial court made no observations in its findings about the mother's interaction with the child, *compare* Oct. 8, 2019 Decision and Jgmt. Entry at 5 with R.C. 2151.414(D)(1)(a), did not state what the child's wishes for placement were despite an in camera interview, *compare* Oct. 8, 2019 Decision and Jgmt. Entry at 6 with R.C. 2151.414(D)(1)(b), and did not issue a conclusion

No. 19AP-700

whether a legally secure placement could be achieved without granting permanent custody to the agency. *Compare* Oct. 8, 2019 Decision and Jgmt. Entry at 5 with R.C. 2151.414(D)(1)(d). And though questions about cultural sensitivity and F.N.'s cultural norms have been pervasive throughout this case, the court's entry failed to make any reference to her country of origin beyond observing that she was "from West Africa." (Oct. 8, 2019 Decision and Jgmt. Entry at 2). The entry also fails to mention the date of the trial, T.W.'s age, or his date of birth. (Oct. 8, 2019 Decision and Jgmt. Entry.)

{¶ 14} Accordingly, based on this judgment entry, there is no way for us to be certain that the trial court's judgment correctly analyzed the evidence in light of the statutory best interest factors. For these reasons, the appellant's assignment of error is sustained and the judgment of the trial court is reversed and remanded so that the trial court may make and provide a more complete assessment.

*Judgment reversed and remanded with instructions.*

KLATT and NELSON, JJ., concur.