[Cite as *In re J.C.*, 2024-Ohio-5107.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 23AP-83 |
| J.C. et al., | : | (C.P.C. No. 14JU-2421) |
| [N.H., Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on October 24, 2024

**On brief:** *Mitchell A. Williams*, Franklin County Public Defender, and *Robert D. Essex*, for appellant.

**On brief:** *Robert McClaren* and *Jessica Birrer*, for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, P.J.

{¶ 1} Appellant, N.H., mother, appeals from the January 27, 2023 decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating her parental rights and granting permanent custody of the minor children to appellee, Franklin County Children Services ("FCCS"). For the reasons that follow, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} There are five children at issue in this case: J.C. (d.o.b. February 12, 2009); As.C. (d.o.b. January 3, 2010); An.C. (d.o.b. November 8, 2010); K.C. (d.o.b. December 13, 2012); and Ab.C. (d.o.b. July 2, 2013) (collectively referred to as "children").

{¶ 3} On February 28, 2014, FCCS filed a complaint alleging the children were dependent minors pursuant to R.C. 2151.04(C). The children were adjudicated to be dependent minors on April 23, 2014. On March 25, 2016, the maternal grandfather, P.H.,

filed a motion for legal custody of all five children.  P.H. was given temporary custody on April 6, 2016.  On July 7, 2016, after years of attempted reunification, the trial court awarded legal custody to P.H.

{¶ 4}  In 2019, P.H. was hospitalized and became unable to care for the children.[1] The maternal aunt, after attempting to care for the children, returned them to FCCS.  On April 3, 2019, FCCS filed a motion for emergency shelter care and alternative disposition for the children.  The trial court issued a temporary order of custody to FCCS on April 4, 2019.  During an October 18, 2019 hearing, the trial court granted FCCS's request for alternative disposition, terminated the temporary order of custody, maintained wardship, and placed the children in the temporary custody of FCCS.  A case plan was adopted at that time.

{¶ 5}  On January 25, 2021, FCCS filed a motion for permanent custody. On July 20, 2022, the Guardian ad Litem ("GAL") filed a motion requesting that an attorney be appointed for J.C. and An.C., which was granted.  A trial in this matter was held on August 22, 23, and November 22, 2022 at which the following evidence was adduced.

{¶ 6}  N.H. testified that she is the mother of the children in this case and that they were originally removed from her custody in November 2013.  (Aug. 22, 2022 Tr. at 19.) N.H. acknowledged that her father had legal custody of the children in July 2016.  (Tr. at 19.)  N.H. stated that her case plan required her to complete a mental health evaluation, counseling, alcohol and other drug ("AOD") classes, parenting classes, and find suitable housing. (Tr. at 20-21.)  N.H. acknowledged that AOD treatment was required because she struggles with substance abuse but claimed that she had been sober for over three years. (Tr. at 21.) N.H. conceded that she has struggled with substance abuse most of her life.  (Tr. at 21.)  N.H. disputed that she admitted in one of her assessments to using heroin in June 2019. (Tr. at 22.)  N.H. also disputed that she relapsed with Vicodin in January 2020.  (Tr. at 22.)  N.H. stated that in the past, cocaine was a problematic drug for her, but she claimed to have not used it in ten years.  (Tr. at 23.)  However, N.H. admitted that she was discharged from Family Recovery Court for cocaine use and "t[aking] a bag" in February 2020.  (Tr. at 26-27.)  N.H. acknowledged that she still uses marijuana every day.  (Tr. at 23.)  N.H. does not count marijuana towards her sober date.  (Tr. at 29.)  "I like smokin' (sic) weed. I enjoy smokin' (sic) weed.  I don't wanna (sic) quit but if it means me havin'

---

[1] P.H. passed away on February 24, 2022.  (Aug. 22, 2022 Tr. at 42.)

(sic) a better life then I'm gonna (sic) quit." (Tr. at 30.) According to N.H., she has previously participated in a Suboxone treatment program through Talbot Hall but has switched providers on multiple occasions. (Tr. at 24-25.) In February 2020, N.H. returned to Talbot Hall for partial hospitalization treatment. (Tr. at 27.) In April 2020, N.H. went to Lower Lights Christian Recovery for two months but was asked to leave. (Tr. at 27.) N.H. then went to Buckeye Health and Research program for nearly one year before switching to her current program at Sunrise Treatment Center ("Sunrise") in May 2022. (Tr. at 28.) N.H. testified that she completed her AOD assessment at Sunrise. (Tr. at 28-29.)

{¶ 7} While N.H. conceded that she previously sold drugs, she testified that she has not sold drugs in over 5 years. (Tr. at 30.) According to N.H., some of her children were kidnapped by a Mexican drug cartel in 2012. (Tr. at 30-31.) N.H. stated that the kidnapping lasted 35 days, and the kids were mistreated during this time. (Tr. at 31.) N.H. has a history of depression, anxiety, post-traumatic stress disorder ("PTSD"), bipolar disorder, split personality disorder, and self-harm. (Tr. at 32-33.) N.H. acknowledged that she self-harmed when FCCS was initially involved with her family in late 2013. (Tr. at 32.) According to N.H., she has been hospitalized for mental health treatment "[t]oo many [times] to count." (Tr. at 33.) N.H. stated that the first time was "around 12" and the last time was "[e]ither last year or the middle of the year some time." (Tr. at 33.) N.H. does not recall all the drugs she has been prescribed but stated that it is "[a] lot. I just know the one[']s I'm currently on." (Tr. at 34.) N.H. is presently prescribed Celexa, Vistriol, Clonidine, Suboxone, and Gabapentin. (Tr. at 35.) N.H. completed the psychological evaluation in September 2021. (Tr. at 37.) N.H. stated that she is not currently in mental health treatment because they stopped that type of treatment at Sunrise. (Tr. at 38.)

{¶ 8} Concerning housing, N.H. acknowledged that she has had unstable housing in the past and reported to her caseworker that she was living at the Van Buren Shelter in January 2020. (Tr. at 40.) In March 2020, N.H. was banned from shelters in Columbus for 60 days because of fighting with another resident. (Tr. at 41.) In June 2021, N.H. moved into her father's residence purportedly to take care of him. (Tr. at 42.) N.H., however, conceded that her father had a Civil Protection Order against her that expired on May 31, 2021. (Tr. at 43.)

{¶ 9} At the time of her August 22, 2022 testimony, N.H. was residing with her boyfriend and his aunt. (Tr. at 43-44.) N.H. testified that the residence has four or five

bedrooms but all of them were occupied. N.H. is not on the residence's lease and does not have any of the utility bills in her name. (Tr. at 44, 46.) N.H. acknowledged that she reported to her AOD clinician that her boyfriend was abusive to her, and she has tried to separate from him in the past. (Tr. at 45.) N.H. testified that she has worked at the Big Lots warehouse for about two weeks prior to trial. (Tr. at 48.) N.H. had previously worked as a cleaner in hospitals for three years. (Tr. at 48-49.)

{¶ 10} N.H. acknowledged that visitation was made available to her in April 2019. (Tr. at 50.) N.H. testified that between April 4, 2019 to August 23, 2019, she did not attend any visits with her children. N.H. conceded that she missed visits when they were scheduled due to transportation issues and oversleeping. (Tr. at 51.) N.H. has not visited her children since December 14, 2019. (Tr. at 52.) N.H. described her prior interactions with her children but noted that the protection order with her father limited her involvement during that period. (Tr. at 53.) N.H. conceded that the time away from her kids has impacted their relationship. (Tr. at 54.) N.H. was aware of behavioral issues with An.C. but did not get him assessed. (Tr. at 55-56.) N.H. does not know of the other children's behavioral health issues because "nobody [will] return my calls. Nobody calls me back for nothin' (sic)." (Tr. at 57.) N.H. believes that An.C. and the other children were traumatized from being kidnapped in Mexico. (Tr. at 59.)

{¶ 11} N.H. testified that part of the reason she could not visit her children between February and May of this year was her failure to comply with the substance and mental health requirements. (Aug. 23, 2022 Tr. at 8-9.) N.H. recognized the harm the prior incidents of abuse have had on her kids. (Tr. at 16.) N.H. conceded that she has self-medicated with marijuana. (Tr. at 22.) N.H. acknowledged it is not fair to the children to let this matter "drag on" any further as she keeps working on her case plan. (Tr. at 26.)

{¶ 12} Justin Chesser testified that he is the addictions counselor at Sunrise. (Tr. at 30.) On May 4, 2022, Chesser conducted the AOD assessment for N.H., which showed "cannabis use disorder severe, opioid use disorder severe and cocaine use order or use disorder moderate and sustained remission." (Tr. at 37, 39.) Chesser recommended N.H. attend intensive out-patient therapy. (Tr. at 40.) Chesser noted that N.H.'s continued use of marijuana is not consistent with her treatment goals and is not compliant with probation. (Tr. at 43-44.) Chesser does not believe N.H. is getting mental health treatment at this time. (Tr. at 46.)

{¶ 13} On cross-examination, Chesser noted that he has made a mental health referral for N.H. (Tr. at 51.) Chesser stated that N.H. is on probation for misdemeanor assault. (Tr. at 67.) According to Chesser, N.H. told him that she was in an abusive relationship. (Tr. at 45.) Chesser read part of his report stating, "[N.H.] shared that she moved back in with boyfriend about four nights ago because she felt she didn't have any other choice. [N.H.] reported that he followed her to her new job and it doesn't matter where she goes because he always finds her." (Tr. at 72.)

{¶ 14} Cassandra McKay has been the caseworker in this matter since 2019. (Tr. at 82-83.) According to McKay, the original complaint in this case was filed in December 2013 and the children were adjudicated dependent in April 2014. (Tr. at 85.) Legal custody was initially given to the children's grandfather, P.H., in 2016. (Tr. at 87.) According to McKay, when P.H. was hospitalized, the children's aunt attempted to take care of the children. (Tr. at 88.) In April 2019, the agency filed for emergency custody order and the children have been in FCCS's continuous custody since that time. (Tr. at 88.)

{¶ 15} According to McKay, paternity has not been established for any of the children. (Tr. at 89.) McKay testified that while An.C. and J.C. are placed together in one foster home, As.C., K.C., and Ab.C. are each in three separate foster homes. (Tr. at 90.) McKay testified that at one point the children were all placed together but based on behavioral and medical concerns, they were split up. (Tr. at 91.) McKay testified that N.H.'s case plan includes: an AOD assessment, follow through with all recommendations, random drug screens, a psychological assessment, obtaining or maintaining a source of income, stable housing, meeting with a caseworker at least once a month, sign all releases, and a parenting component. (Tr. at 93.)

{¶ 16} According to McKay, she has gone over the case plan with N.H. and provided referrals for an AOD assessment. (Tr. at 95.) McKay testified that she did receive an AOD assessment from Sunrise the day before her testimony. (Tr. at 98.) McKay indicated that N.H. was enrolled in Recovery Court in 2019, but then disappeared for some time. (Tr. at 99-100.) Consequently, Recovery Court initiated a warrant in January 2020. Recovery Court dropped the warrant and ultimately terminated her as unsuccessful from the program. (Tr. at 100.) McKay has ongoing concerns about N.H.'s substance abuse and recalled that N.H.'s AOD assessment noted that her longest period of sobriety was 15 days. (Tr. at 101.) McKay also testified that N.H.'s mental health has also been a major barrier to

her sobriety.  (Nov. 22, 2022 Tr. at 7-8.)[2]  McKay referred N.H. for a mental health assessment, which was completed in late 2021.  (Tr. at 8.)  McKay is not aware of N.H. participating in any mental health services over the life of the case.  (Tr. at 10.)

{¶ 17} Concerning the stable housing component of the case plan, McKay testified that Recovery Court had helped N.H. obtain a sober living home, but she was asked to leave.  (Tr. at 11.)  N.H. is currently living with a friend but McKay was not invited inside to inspect the residence.  (Tr. at 12.)  N.H. is reportedly now working at the Franklin County Courthouse, Café Overlook, but that has not been confirmed.  (Tr. at 13.)  According to McKay, N.H. has never provided a paystub to demonstrate proof of income.  (Tr. at 13.)  McKay went on to describe her efforts to locate the children's fathers, which were ultimately unsuccessful.  (Tr. at 14.)  When visits were allowed, McKay characterized the visits as lacking order with the children yelling, flipping furniture, pushing, and verbally arguing with one another.  "[There was] little to no direction by the legal custodian or mother given."  (Tr. at 15.)  Ultimately, N.H.'s visitation was suspended in January 2020 for lack of attendance and concerns with her substance use and mental health.  (Tr. at 19.)  Since January 2020, visits have not resumed.  (Tr. at 19.)  McKay did not believe the children were bonded with N.H.  (Tr. at 15, 20.)

{¶ 18} McKay has observed the children in their current foster placements.  J.C. has had three placements and is currently in a foster home with his brother, An.C.  (Tr. at 23.)  An.C. has had homicidal and suicidal ideations that resulted in a ten-month stay at Belmont Pines.  (Tr. at 25.)  An.C. also has attention-deficit/hyperactivity disorder ("ADHD"), disruptive conduct disorder, and emotional disturbances and is receiving intensive in-school counseling and medication.  (Tr. at 33-34.)  J.C. has PTSD and conduct disorder and has done well with counseling in the past.  (Tr. at 33.)  McKay stated that J.C. and An.C. are bonded with their foster family and do things as a normal family unit like going to dinner, shopping, and extracurricular activities.  (Tr. at 27-28.)  As.C. resides in her original foster home with no other siblings.  (Tr. at 21-22.)  As.C. is in counseling for "other trauma as specified related disorder" and much of her concerns are anxiety-induced.  (Tr. at 34-35.)  As.C. also has an unidentified internal illness and has received treatment.  (Tr. at 46-47.)  As.C. is bonded with her foster family and has expressed a desire for stability and a family.

---

[2] The trial was delayed until November 22, 2022 due to one of the attorneys contracting COVID-19.  (Nov. 22, 2022 Tr. at 4.)

(Tr. at 28.) K.C. was in her original foster home from April 2019 to December 2021 but that placement was disrupted based on her behavior. (Tr. at 21.) K.C. has been in a new placement for nearly one year. (Tr. at 21.) K.C. was diagnosed with emotional disturbances from her trauma and environmental changes and is in counseling. (Tr. at 33.) K.C. has a great relationship with her current foster family and is happy with the placement. (Tr. at 29.) Ab.C. has had three placements over the life of the case. (Tr. at 26.) Ab.C. is doing well in school and in his placement. McKay noted that Ab.C. is also bonded with the older child in the home. (Tr. at 30.) Ab.C. is diagnosed with ADHD and conduct disorder and receives psychiatric services. (Tr. at 32.) McKay testified that the primary reason there is no bond between the children and their mother is the lack of visitation over the last two years. (Tr. at 39.) McKay acknowledged that N.H. attended a Christmas party with her children in 2020, but McKay was not present at that event. (Tr. at 44.)

{¶ 19} According to McKay, As.C., Ab.C., and K.C. are all in potentially adoptive homes. (Tr. at 37.) McKay testified that if FCCS got permanent court commitment for the children, they would look for adoptive homes for An.C. and J.C. (Tr. at 36.) McKay recommended that the court grant permanent custody in the case. (Tr. at 36.)

{¶ 20} David Rowland has been the GAL for the children since 2014. (Tr. at 50.) Rowland has observed all the children throughout the life of the case and in their current foster placements. (Tr. at 51.) According to Rowland, all the children are bonded with their foster placements and the current foster placements are attentive to the children's needs. (Tr. at 51-52.) Rowland initiated the suspension of visitation based on N.H.'s failure to show up for visits. (Tr. at 53-54.) According to Rowland, N.H. was difficult to find for a period as she did not maintain a regular residence. (Tr. at 55.) Rowland testified that N.H. is currently employed at Café Overlook. (Tr. at 56.) Rowland does not have any information about N.H.'s current housing situation and his limited interactions with her have been at the courthouse bus stop. (Tr. at 58-59.) Rowland testified that he believes the fathers in this case have either been deported or voluntarily left the country. (Tr. at 59.)

{¶ 21} Rowland stated most of the children, with the possible exception of Ab.C., are emotionally intelligent enough to understand the situation and outcome. (Tr. at 60.) According to Rowland, the children want to stay in their foster homes, though An.C. and J.C. did indicate a desire to visit with N.H. (Tr. at 60.) Rowland testified that as it stands, he does not believe the children have a bond with their mother. (Tr. at 61.) "I think it's just

primarily because of - - of mother's absence from the parenting role, some of it may have been because they were traumatized when they were taken to Mexico, but that's been a long time ago. And the bonding just never got better." (Tr. at 61.) Rowland, however, did note that the children are bonded with each other. (Tr. at 62.) Rowland recommended that permanent custody be granted in this case. (Tr. at 63.)

{¶ 22} N.H. was called again as a witness in this case. Since the first day of trial in August, N.H. has moved into a new residence. (Tr. at 70.) Though her current residence has three bedrooms, N.H. believes she could handle the five children in the house and manage their special needs. (Tr. at 98, 100.) While N.H. is employed as a baker at Café Overlook, and makes $15 dollars per hour, she was recently hit by a motor vehicle. (Tr. at 71- 73.) While N.H. has a legal source of income, she is not working right now because her glasses were broken in the automobile accident. (Tr. at 73.) N.H. is in AOD treatment at Buckeye Health and Research and has completed an assessment. (Tr. at 81.) N.H. has a prescription for Suboxone and is taking it twice daily. (Tr. at 82.) According to N.H., the only other drug she tested positive for in the last year is marijuana. (Tr. at 83.) N.H. acknowledged that she has not been meeting with her caseworker once a month per the case plan. (Tr. at 90-91.) N.H. contended that FCCS has not made efforts to help her during the life of the case. (Tr. at 92.) N.H. was still on probation but believed that she will be off probation by the end of 2022. (Tr. at 95.)

{¶ 23} On January 27, 2023, the trial court awarded FCCS permanent custody of the children and divested N.H. and alleged fathers, J.C.S., A.F., and John Doe of their parental rights. (Jan. 27, 2023 Decision & Jgmt. Entry at 25-26.)

{¶ 24} N.H. filed a timely appeal in this matter.

## II. ASSIGNMENT OF ERROR

{¶ 25} N.H. submits the following assignment of error:

> The trial court committed reversible error by terminating the appellant-mother's parental rights when the decision was against the manifest weight of the evidence.

## III. LEGAL ANALYSIS

### A. Appellant's Sole Assignment of Error

{¶ 26} In N.H.'s sole assignment of error, she alleges that the trial court's decision to terminate her parental rights was against the manifest weight of the evidence.

{¶ 27} The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution protects an individual's right to parent one's child. *In re L.M.*, 10th Dist. No. 21AP-580, 2023-Ohio-4326, ¶ 41, citing *In re T.N.*, 10th Dist. No. 21AP-429, 2022-Ohio-2784, ¶ 45, citing *In re H.S.*, 10th Dist. No. 21AP-190, 2022-Ohio-506, ¶ 47, citing *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. Ohio courts have held that it is an essential and basic civil right of a parent to raise their child. *In re B.H.*, 10th Dist. No. 22AP-670, 2023-Ohio-3491, ¶ 22, citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 28} The right of a parent to raise their child, however, is not absolute. *In re K.M.*, 10th Dist. No. 23AP-168, 2024-Ohio-2137, ¶ 31. "In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child." (Further citation omitted.) *In re K.R.*, 10th Dist. No. 22AP-51, 2023-Ohio-359, ¶ 11, citing *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10.

{¶ 29} Termination of parental rights is governed by R.C. 2151.414. *K.M.* at ¶ 32. As set forth in R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children's services agency if the court determines, by clear and convincing evidence, that (1) any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) are applicable, and (2) it is in the best interest of the child to grant the agency's motion for permanent custody. *Id.*, citing *In re Z.C.*, 173 Ohio St.3d 359, 2023-Ohio-4703, ¶ 7. " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 24, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 30} Concerning the first prong, R.C. 2151.414(B)(1)(a) through (e) sets out the following circumstances:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 31} If the trial court concludes that any of the above factors are applicable, the trial court then must examine R.C. 2151.414(D)(1) to determine whether granting permanent custody is in the best interest of the child. When considering whether granting a motion for permanent custody is in the child's best interest, the trial court "shall consider all relevant factors, including, but not limited to, the following:"

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[3]

R.C. 2151.414(D)(1)(a) through (e).

{¶ 32} Though a trial court is not required to expressly examine each R.C. 2151.414(D)(1) factor, it must make some indication on the record that all the factors were considered. *L.M.* at ¶ 45, citing *In re T.W.*, 10th Dist. No. 19AP-700, 2020-Ohio-4712, ¶ 12, citing *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 53. Under this statutory examination, no single factor warrants more weight than the other factors. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 33} A trial court's determination in a permanent custody matter will not be reversed by a reviewing court unless the court finds the decision was against the manifest weight of the evidence. *In re R.M.A.L.O.*, 10th Dist. No. 22AP-425, 2023-Ohio-3695, ¶ 40, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v.*

---

[3] R.C. 2151.414(E)(7) through (11) provide additional factors, such as:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

*Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). In such a review, an appellate court must make every reasonable presumption in favor of the juvenile court's findings of fact. (Citations omitted.) *K.M.* at ¶ 34. "A juvenile court's grant of permanent custody is not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *L.M.* at ¶ 46, citing *In re J.J.*, 10th Dist. No. 21AP-166, 2022-Ohio-907, ¶ 18, citing *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 9.

### 1. R.C. 2151.414(B)(1)(a) through (e)

{¶ 34} While the trial court found multiple circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) were applicable, we will limit our examination to (B)(1)(d) as it resolves the first prong of the statutory analysis.[4] The trial court found that R.C. 2151.414(B)(1)(d) was satisfied as there was clear and convincing evidence that the children have been in the continuous custody of FCCS since April 2, 2019. (Decision & Jgmt. Entry at 25.) The trial court determined that the children have been in the custody of FCCS for 12 months of a consecutive 22-month period. Upon review, we agree with the trial court that R.C. 2151.414(B)(1)(d) is satisfied, and we will focus our analysis on whether there was competent, credible evidence that the grant of permanent custody was in the best interest of the children. In reaching this determination, we review the trial court's findings of all relevant factors, including the five enumerated factors provided in R.C. 2151.414(D)(1)(a) through (e).

### 2. Best Interest Analysis (R.C. 2151.414(D)(1)(a) through (e))[5]

### a. Children's Interactions and Relationships (R.C. 2151.414(D)(1)(a))

{¶ 35} As set forth in R.C. 2151.414(D)(1)(a), the first factor in determining whether permanent custody is in the children's best interest requires the trial court to examine the children's interactions and relationships with the parents, siblings, foster caregivers, and others.

---

[4] The trial court also found that R.C. 2151.414(B)(1)(a) applies as the children could not be placed with the mother or alleged fathers within a reasonable time and should not be placed with any of their parents. (Decision & Jgmt. Entry at 25.) However, as we have concluded that (B)(1)(d) is satisfied, we will decline to address the alternative finding, but we will consider aspects of this factor in the context of the (D)(1)(e) analysis. (Decision & Jgmt. Entry at 23-25.)

[5] FCCS also argued in its motion for permanent custody that there was an automatic finding of best interest under R.C. 2151.414(D)(2). However, we decline to address this alternative argument as we find that the trial court's findings under (D)(1)(a) through (e) were met and not against the manifest weight of the evidence.

{¶ 36} N.H.'s interactions with her children have been extremely limited in recent years. N.H. acknowledged that visitation was made available to her in April 2019. (Aug. 22, 2022 Tr. at 50.) N.H. also acknowledged that she has not visited her children since December 14, 2019. (Tr. at 52.) Rowland initiated the suspension of visitation based on the N.H.'s failure to show up for visits. (Tr. at 54.) According to Rowland, N.H. was difficult to find for some time as she did not maintain a regular residence. (Tr. at 55.) When N.H. did visit, McKay described the visits as lacking order with the children yelling, flipping furniture, pushing, and verbally arguing with one another. "[There was] little to no direction by the legal custodian or mother given." (Nov. 22, 2022 Tr. at 15.) N.H. conceded that at one point, some of her children were kidnapped by a Mexican drug cartel in 2012. (Aug. 22, 2022 Tr. at 30-31.) N.H. stated that the kidnapping lasted 35 days and the kids were mistreated during that time. (Tr. at 31.) N.H. testified that the children were traumatized from being kidnapped in Mexico. (Tr. at 59.) McKay stated that she did not observe the children were bonded with N.H. (Nov. 22, 2022 Tr. at 15, 20.) McKay noted that the primary reason there was no bond between the children and their mother is the lack of visitation over the last two years. (Tr. at 39.) While the children were in the care of their grandfather for a time, he has since passed away.

{¶ 37} Rowland testified that he has observed all the children throughout the case and in their current foster placements. (Aug. 22, 2022 Tr. at 51.) According to Rowland, all the children are bonded with their foster placements, and the current foster placements are attentive to the children's needs. (Tr. at 51-52.) This factor favors FCCS.

### b. Children's Wishes (R.C. 2151.414(D)(1)(b))

{¶ 38} The second factor to consider is the custodial wishes of the children. According to Rowland, the children want to stay in their current foster homes. Rowland testified that, until recently, none of the children wanted to visit with N.H. Am.C. and J.C. have since indicated a desire to visit with N.H. (Nov. 22, 2022 Tr. at 60.) The other three children have noted that they do not desire to visit with their mother. Rowland noted that the children are bonded with each other. (Tr. at 62.) This factor also favors FCCS.

### c. Custodial History (R.C. 2151.414(D)(1)(c))

{¶ 39} The third factor in determining the children's best interest is examining the children's custodial history. Here, the trial court concluded the children have been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. R.C.

2151.414(D)(1)(c). Upon review of the transcript and record, we agree with the trial court and find the children have been in FCCS's custody well beyond the statutory requirements. This factor favors FCCS.

### d. The Children's Need for a Legally Secure Permanent Placement (R.C. 2151.414(D)(1)(d))

{¶ 40} The fourth factor considers the children's need for legally secure placement and whether the type of placement can be achieved without granting permanent custody to FCCS.

{¶ 41} Here, it is evident that the children need legally secure placement. The fathers are not viable alternatives. Rowland testified that he believes the fathers in this case have either been deported or voluntarily left the country. (Aug. 22, 2022 Tr. at 59.) The children's grandfather, P.H., took custody of the children until he was unable to care for them due to his failing health. The children's maternal aunt attempted to care for the children. However, on April 2, 2019, she brought the children back to FCCS claiming that she was not able to care for them any longer. No other family member is a reasonable alternative at this time.

{¶ 42} McKay testified that while the children were initially placed together, based on behavioral and medical concerns, they were split up. (Tr. at 91.) McKay testified that As.C., Ab.C., and K.C. are in potentially adoptive homes. (Tr. at 37.) If FCCS got permanent court commitment for the children, McKay stated they would look for adoptive homes for An.C. and J.C. (Tr. at 36.)

{¶ 43} The only argument meaningfully presented in N.H.'s brief concerns the case plan. N.H. argues that while she did not complete all aspects of the case plan, "despite her struggles, she showed her devotion to her children and a desire to reunite with them." (Appellant's Brief at 20.) N.H. argues that she has complied with aspects of the case plan as she has completed the AOD and psychological assessments, received medication for her mental health diagnoses, and self-reported employment and housing. (Appellant's Brief at 20.) However, we do not find N.H.'s argument compelling. This court has held that completion of some or all of the case plan is not a guarantee that parental rights will be restored. *In re B.R.*, 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 47, citing *In re E.B.*, 12th Dist. No. CA2009-10-139, 2010-Ohio-1122, ¶ 30; *See also In re Conn*, 10th Dist. No. 03AP-348, 2003-Ohio-5344, ¶ 19 ("Substantial completion of case plan requirements does not

preclude a grant of permanent custody to a social services agency * * * we must consider whether the parent has substantially remedied the conditions that caused the child's removal."). Thus, the central focus becomes whether N.H. has substantially remedied the conditions that caused the children's removal and ability to meet the children's basic needs.

{¶ 44} While N.H. claims that she is taking her mental health medication as required by the case plan, she acknowledged that she was not currently in mental health treatment because they stopped that type of treatment at Sunrise. (Tr. at 38.) While N.H. completed an AOD assessment, she admitted to cocaine and marijuana use beyond her purported sobriety date. (Tr at 27, 30.) N.H. has also failed to successfully complete a treatment program despite admitting that she struggles with substance abuse. (Tr. at 21.) While the trial court also ordered N.H. to participate in Recovery Court on multiple occasions, she was unsuccessfully terminated from the program for noncompliance.

{¶ 45} While N.H. has purportedly obtained new housing, she has not allowed the caseworker to inspect the home for suitability. (Nov. 22, 2022 Tr. at 12.) Moreover, N.H. has consistently been in unstable relationships and living situations. Most notably, the children were kidnapped by a drug cartel and taken to Mexico in 2012. (Aug. 22, 2022 Tr. at 30-31.) Recently, N.H. was in a relationship that she admitted was violent. N.H. has also displayed violent tendencies of her own. N.H. was asked to leave a sober living facility over an altercation with another resident and was banned from Columbus shelters for 60 days due to fighting. (Nov. 22, 2022 Tr. at 11; Aug. 22, 2022 Tr. at 40-41.) N.H. was also on probation during this trial for a misdemeanor assault conviction in 2022. (Aug. 23, 2022 Tr. at 67.)

{¶ 46} Concerning employment, while N.H. has purportedly obtained work at Café Overlook, she failed to provide a paycheck stub to her caseworker. (Nov. 22, 2022 Tr. at 13.) Even if the employment was accurate, N.H. was not working at that time due to broken glasses from an automobile accident.

{¶ 47} As to visitation, N.H. failed to appear multiple times for visitation with the children. When she did appear, the children were not appropriately supervised. N.H.'s visitation was initially suspended due to failure to appear as well as mental health and substance abuse concerns. N.H. acknowledged that she has not visited her children since December 14, 2019. (Aug. 22, 2022 Tr. at 52.) Based on the above considerations, this factor also favors FCCS as the children need legally secure permanent placement.

### e. Whether Any of the Factors in Divisions R.C. 2151.414 (E)(7) through (E)(11) Apply in Relation to the Parent and Child (R.C. 2151.414(D)(1)(e))

{¶ 48} Finally, we look at whether any of the factors provided in divisions R.C. 2151.141 (E)(7) through (E)(11) are applicable. Upon review, we agree with the trial court that (E)(8) applies as N.H. repeatedly withheld medical treatment when she had the means to do so, and she never sought care or treatment for the children after their kidnapping for 35 days by a Mexican drug cartel. We also find that (E)(9) is also applicable as N.H. has placed the children in substantial risk of harm two or more times due to alcohol or drug use, and she rejected treatment on multiple occasions after the case plan required treatment. Finally, we agree with the trial court that (E)(10) applies as all the parents, including N.H., have abandoned the children. (Decision & Jgmt. Entry at 23.)

### f. Conclusion of Best Interest Analysis

{¶ 49} In the case sub judice, the trial court properly reviewed and weighed the evidence regarding all the factors relevant to determining whether a grant of permanent custody to FCCS was in the children's best interest. "The 'overriding concern' in any child custody case is to reach a disposition that is in the child's best interests." *In re B.B.*, 10th Dist. No. 20AP-488, 2021-Ohio-2299, ¶ 69, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist.1996). After a careful review of the evidence and testimony presented at the hearing, there was competent, credible evidence to support the trial court's conclusion that terminating N.H.'s parental rights was in the children's best interest. Thus, we cannot find that the trial court's determination was against the manifest weight of the evidence.

{¶ 50} For the above reasons, N.H.'s sole assignment of error is overruled.

## IV. CONCLUSION

{¶ 51} Having overruled N.H.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, as to the termination of her parental rights and permanently divesting her of any and all parental rights, privileges, and obligations.

*Judgment affirmed.*

DORRIAN and EDELSTEIN, JJ., concur.

_____