[Cite as *In re Ju.B.*, 2025-Ohio-5418.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | No. 24AP-73 |
| | | (C.P.C. No. 18JU-12584) |
| [Ju.B.] | : | |
| | | (REGULAR CALENDAR) |
| (T.B., | : | |
| | | |
| Appellant). | : | |
| | | |
| In the Matter of: | : | No. 24AP-74 |
| | | (C.P.C. No. 18JU-12583) |
| R.B., | : | |
| | | (REGULAR CALENDAR) |
| (T.B., | : | |
| | | |
| Appellant). | : | |
| | | |
| In the Matter of: | : | No. 24AP-76 |
| | | (C.P.C. No. 18JU-12582) |
| J.B. et al. [(As to Jo.B. only)] | : | |
| | | (REGULAR CALENDAR) |
| (T.B., | : | |
| | | |
| Appellant). | : | |
| | : | |

D E C I S I O N

Rendered on December 4, 2025

**On brief:** *Victoria E. Ullman*, pro se. **Argued:** *Victoria E. Ullman.*

**On brief:** *Mitchell A. Willams*, Public Defender, and *Timothy E. Pierce* for appellant T.B. **Argued:** *Timothy E. Pierce.*

**On brief:** *Sharon K. Carney* for Franklin County Children Services. **Argued:** *Sharon K. Carney.*

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1}   Appellant, T.B., mother of Ju.B., Jo.B., and R.B., appeals from the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody filed by appellee, Franklin County Children Services ("FCCS").  Victoria E. Ullman, the guardian ad litem ("GAL") originally appointed to represent the children's best interests, appeals from the trial court's entry ordering her removal.  For the following reasons, we affirm the judgment of the trial court.

## I.  Factual and Procedural Background

{¶ 2}   On October 29, 2018, FCCS filed three complaints concerning the children of T.B. and father J.B., who is now deceased.  R.B., the youngest child, was seven months at the time.  FCCS alleged that T.B. and her baby had tested positive for oxycodone after the birth, R.B. had "suffered from withdrawal symptoms" afterward, and that T.B. did not have a prescription for the drug.  (Oct. 29, 2018 Compl.)  Although T.B. had initially agreed to voluntary supervision by FCCS, she only completed one drug screen, which resulted in a positive result for oxycodone.  T.B "missed all other scheduled screens" and failed to meet with or return calls from her caseworker.  *Id.*  FCCS alleged that R.B. was an abused child under R.C. 2151.031(C) and 2151.031(D), a neglected child under R.C. 2151.03(A)(2), and a dependent child under R.C. 2151.04(C).  These allegations formed the basis for complaints alleging that Ju.B., aged eight, and Jo.B., aged two, were dependent children under R.C. 2151.04(C) as well.[1]  A magistrate placed the children under a temporary order of protective supervision ("TOPS") on October 30, 2018, which allowed them to remain at home.  On November 7, 2018, the magistrate appointed Ms. Ullman as GAL for the children.

{¶ 3}   On November 29, 2018, the magistrate held an adjudicatory hearing on the dependency cause of action, as FCCS had requested dismissal of the charges of abuse and neglect.  The matter was uncontested and the magistrate found that Ju.B., Jo.B., and R.B. were dependent children under R.C. 2151.04(C).  The magistrate terminated the TOPS and

---

[1] Another child, aged ten at the time FCCS brought its claims, is not the subject of this appeal because T.B. voluntarily agreed to his foster parents' request for legal custody.

placed the children under court-ordered protective supervision ("COPS") by FCCS under R.C. 2151.353(A). In addition, the magistrate approved and adopted the case plan, which required T.B. to obtain and maintain housing and employment, submit to random drug screens, substance abuse assessment and mental health assessment, and follow through with resulting any recommendations.

{¶ 4} On March 20, 2019, FCCS filed a motion requesting an order for temporary custody of the children because T.B. "ha[d] not been compliant with the case plan." (Mar. 20, 2019 Mot. at 2.) According to FCCS, T.B. had "missed all 14" drug screens requested, missed behavioral health appointments, failed to meet with a caseworker, and missed multiple doctor's appointments scheduled for the children. *Id.* In addition, a warrant had been issued for T.B.'s arrest on a theft charge. *Id.* at 3. The magistrate granted the motion and ordered temporary custody to FCCS on March 27, 2019. At a hearing held on May 30, 2019, the magistrate ordered the children into temporary court commitment ("TCC") overseen by FCCS and approved an updated case plan. (June 21, 2019 Mag.'s Decision & Jgmt. Entry.)

{¶ 5} FCCS filed motions for permanent custody of the children on August 20, 2020. The agency noted that although T.B. had "completed an alcohol and drug assessment," she "did not follow through." (Aug. 20, 2020 Mot. at 5.) She had failed to complete a mental health assessment and had "missed all random drug screens" in 2019. *Id.* In 2020, T.B. had 16 positive results for suboxone. In addition, she had a positive test result for cocaine and oxycodone, after which she completed no more drug screens. T.B. had also failed to prove that she was able to maintain an income. FCCS requested that the trial court grant the motion for permanent custody because the case plan goals had not been met, nothing indicated future compliance, and the children were in need of "legally secure permanent placement." *Id.* at 7.

{¶ 6} On December 15, 2020, FCCS filed a motion requesting that in-person visitation "be immediately converted to virtual visitation only" after the oldest child, "most likely" after planning with T.B., snuck the children out of the foster home and facilitated a return to their parents' home. (Dec. 15, 2020 Mot. at 2-3.) Her positive results for suboxone occurred when she did not have a prescription for the substance. The magistrate granted the request on December 17, 2020.

{¶ 7}   An amended case plan was filed requiring T.B. to undergo a psychological evaluation after she "experienced a mental health episode" that required medical treatment.  (Apr. 7, 2021 Am. Case Plan at 1.)  In-person visits with the children were permitted to resume on July 2, 2021.

{¶ 8}   Eleven days before trial on the motion for permanent custody, FCCS filed a motion requesting that the court "review" its appointment of Ms. Ullman as the children's GAL.  (Apr. 14, 2022 Mot.)  Although Ms. Ullman had filed a report two days earlier in Ju.B.'s case and Jo.B.'s case, FCCS stated that it was "the first report" that she had filed since the agency had filed the motion for permanent custody on August 20, 2020.  (Apr. 14, 2022 Mot. at 2.)  Furthermore, she had not filed any reports in R.B.'s case.  FCCS also argued that Ms. Ullman had a conflict of interest based on her admission in the report that she had previously represented another of T.B.'s children in a delinquency proceeding, yet had not obtained a written waiver to address the conflict, as required under Ohio Rule of Professional Conduct 1.9(a).

{¶ 9}   The matter was addressed at a hearing on January 9, 2023.  There, FCCS also expressed concerns about Ms. Ullman's repeated assertion that she "intend[ed] to wait" until she heard "the evidence at trial before making a recommendation" to the trial court about the children's best interests, in contradiction of a GAL's duty to provide independent assessments.  (Jan. 9, 2023 Tr. at 17.)  FCCS also expressed concern that Ms. Ullman had never visited the children while in foster placement.  *Id*. at 18.

{¶ 10}  Ms. Ullman responded that she had "continued COVID concerns," that she would have visited the children "[i]f they had stable placement," and that she had "many visits" with T.B.  *Id*. at 20.  She also stated that in her appointment as GAL, she was "already also over [the] fee cap; they're not paying me to [visit the children] and that is a relevant issue."  *Id*.

{¶ 11} The trial court noted that Ms. Ullman had stated during an in-camera discussion that she "had not seen any of the children in their foster care" placement, which the court considered "totally unacceptable."  *Id*. at 22.  In addition, the trial court pressed her for a recommendation, which Ms. Ullman at first resisted before stating that the children should "[g]o back to mom," causing the court to conclude that a conflict existed. *Id*. at 24.  Over Ms. Ullman's protestations, the trial court removed her from the case as

GAL and stated its intention to appoint a different attorney in that role. On January 11, 2023, Crysta Pierson was appointed as the children's GAL. On September 5, 2023, a visiting judge was appointed to replace the previous judge. On December 4, 2023, he held a two-day trial on FCCS's motion for permanent custody.

{¶ 12} FCCS first called Kirstan Webb as a witness, the caseworker assigned to the family between January 2021 and June 2023. (Dec. 4, 2023 Tr. at 14.) Although there had been three caseworkers assigned to the family before her, Ms. Webb was already familiar with and knew the family at the time of her appointment because she had "covered" for one of the previous caseworkers. *Id.* at 15. At the time of trial, Ju.B. was 13, Jo.B. was 7, and R.B. was 5. Their father, J.B., had died on February 24, 2022, during the pendency of the case. His paternity had been established for Ju.B., and was the presumptive father of the other two children.

{¶ 13} According to Ms. Webb, FCCS became involved with the family in the summer of 2018 because T.B. and R.B. tested positive for oxycodone after R.B.'s birth, at which time the baby had withdrawal symptoms. T.B. had obtained the oxycodone without a prescription from her mother and stated that she took it for tooth pain. At the beginning of the case, T.B. had agreed to work with FCCS under voluntary protective supervision, which Ms. Webb explained as an agreement to work with the agency "without any court orders or court involvement." *Id.* at 19.

{¶ 14} Voluntary protective supervision ended, however, after the trial court adjudicated the children dependent and placed the children under COPS. Ms. Webb attributed the dependency adjudications and resulting TCC order to T.B. testing positive for oxycodone during the period of voluntary protective supervision, as well as her failure to participate in other drug screens and "failure to engage" with a substance abuse program after referral by FCCS. *Id.* at 21. In addition, FCCS had "concerns" that the older children "were not attending medical appointments and school consistently." *Id.* at 22. By May 30, 2019, the children were the subject of the trial court's TCC order and FCCS had filed an updated case plan for the family. *Id.*

{¶ 15} Ms. Webb testified that the case plan required T.B. to maintain stable housing and employment, complete an alcohol and drug assessment and a mental health assessment, take random drug screens, and sign releases of information for FCCS. The case

plan also required that T.B. "address certain things," including "identifying stressors" and naming "a sober person to care for the children" as part of her recovery. *Id.* at 24.

{¶ 16} During Ms. Webb's tenure as caseworker, T.B. "successfully completed" the goal of maintaining stable housing and was "fairly stable at maintaining . . . an income or some sort of job or employment." *Id.* at 27-28. Between "the end of 2020 into early 2021," T.B. worked as a home health aide and cleaner through MKS Recovery, a social services agency. *Id.* at 28. T.B. at times had "barriers" regarding transportation, so FCCS provided her with bus passes and gas cards. *Id.* at 29.

{¶ 17} Although T.B. completed alcohol and drug assessments, Ms. Webb testified that she did not follow the recommendations that resulted. Nor did she consistently complete the required drug screens. T.B. "had an issue" with an employee at the agency FCCS contracted with to conduct drug testing and never consistently participated in its randomized tests. *Id.* at 30. She claimed to be undergoing drug testing through MKS Recovery, but the information that Ms. Webb was able to obtain from that organization was difficult to obtain and only covered a portion of the required time period. She acknowledged that she received negative drug test results from MKS Recovery for the period of September of 2021 to April of 2022, and two other negative results in July and September of 2022. *Id.* at 59. However, MKS Recovery was "unable to provide" Ms. Webb with any subsequent test results because "they had lost all drug screens" after a technological problem. *Id.* at 60. In addition, T.B. tested positive for oxycodone, marijuana, and methadone in February of 2022, according to hospital records from the birth of a child at that time. *Id.* at 63. T.B. claimed that a drug treatment provider prescribed the methadone, but did not sign a release after Ms. Webb asked in order to obtain records from the provider. *Id.* From September 13, 2022 to the time Ms. Webb left the case in June of 2023, T.B. only had one screen with the FCCS's approved testing provider, on March 2, 2023. *Id.* at 84. The result was recorded as unable to produce urine, which FCCS "considered a positive screen." *Id.* at 87. By the time Ms. Webb left the case, T.B. only had a ten percent compliance rate with the requested screens. *Id.* at 88.

{¶ 18} T.B. was noncompliant with the required mental health assessment for the same reason—she wanted to have it conducted through MKS Recovery—but Ms. Webb testified that FCCS could not accept it because that organization did not have behavioral

health certifications until 2023.  *Id.* at 33, 51, 83.  Ms. Webb recounted that although T.B. signed a release to obtain information from MRS Recovery, she would not agree to sign releases for other service providers because she did not want "to receive a bad report from them."  *Id.* at 34.

{¶ 19}  Ms. Webb also recounted T.B.'s visitation history with the children.  Initially, the visits occurred at the maternal grandmother's house because FCCS had placed them there after the TCC order, and grandmother supervised the visits.  She became concerned, however, because her daughter sometimes took the children from the home.  T.B. also threatened to kill herself and appeared to be "falling asleep midsentence" during visits.  *Id.* at 35.  As a result, grandmother asked that FCCS supervise the visits.

{¶ 20}  By the time Ms. Webb was assigned as the caseworker, the trial court had ordered visitation to occur virtually because the children had run away in December of 2020.  Virtual visits occurred from January to July of 2021.  After that, visits were in person and supervised by FCCS.  Ms. Webb testified that T.B. was "fairly consistent at attending visits."  *Id.* at 39.  However, she noted some "inappropriate behavior," including arguing with Ju.B.  *Id.* at 39-40.

{¶ 21}  Ms. Webb described Ju.B as "bonded with her mother."  *Id.* at 40.  Ju.B had difficulty with her mother's behavior, but did love her and wanted a relationship with her.  Ms. Webb reported that Jo.B "love[d] her mother very much and she was always very excited" to see her and get her attention during visits.  *Id.*  Ms. Webb described R.B.'s bond with her mother in similar terms.  Although she was "very young" when Ms. Webb observed them, R.B. "was expressing excitement" at being able to see her mother.  *Id.* at 41.

{¶ 22}  Ms. Webb also described the children as "bonded with one another."  The children "car[ed] for one another's safety," they "love[d] spending time with one another, talking about different family members, friends . . . different things that had happened in the past," and, in Ms. Webb's estimation, did "very much love one another."  *Id.* at 41.  Although FCCS "had tried to place all three girls together," the agency could not do so because a number of factors made it "very difficult."  *Id.* at 42.  Ju.B. was "placed separately due to the AWOL incident."  *Id.*  Jo.B.'s behavioral and mental health issues, which required treatment, were "heavily affecting" R.B.  *Id.*

{¶ 23} Ms. Webb also recounted her observations of the children in their foster homes. She described Ju.B. as "significantly bonded" to her foster mother, who gave her "a lot of support" and communicated well with T.B. *Id*. at 43. Ms. Webb had not observed Jo.B. with her foster mother for very long, but observed that she "cared for her very much" and was "really trying" to help Jo.B. get help for academic and behavioral issues. *Id*. at 44. R.B. "adored" her foster mother, who "very much cared for" her as well, and obtained "proper daycare and childcare" for R.B. *Id*. Several kinship placements were "explored" but did not work out. *Id*. at 45. There were unsubstantiated allegations that the maternal grandmother's husband sexually abused R.B. *Id*. at 46. Another relative took the children in, but after a year, "expressed that she was unable or no longer able to care for the girls." *Id*. at 48. An aunt "came forward" at one point, but placement there was not possible due to her own history with FCCS herself and drug use in the home . *Id*.

{¶ 24} FCCS then called Lauren Chase to testify. Ms. Chase replaced Ms. Webb as caseworker and was assigned to the case in June of 2023, five months before trial. *Id*. at 100. She had a "very positive" meeting with T.B. shortly after the assignment and "review[ed] the case plan with her" at that time. *Id*. at 101. The case plan's objectives remained the same. As before, T.B. had been able to meet the objective of maintaining stable housing. Although T.B. stated that she was working, Ms. Chase testified that T.B. was not always employed and Ms. Chase had "never been able to verify [her] employment" prior to trial. *Id*. at 103. Ms. Chase asked for paystubs and information about T.B.'s previous employers and none were provided. *Id*. at 119-20.

{¶ 25} T.B. told Ms. Chase that she had "already completed" mental health and substance abuse assessments. *Id*. at 104. Ms. Chase explained that FCCS "didn't have any records of those being completed" and offered to request them or have T.B. "complete new assessments." *Id*. Ms. Chase emailed T.B. information about resources, including drug testing. After playing "phone tag" with each other, Ms. Chase was able to provide T.B. with a bus pass in July, but T.B. never updated her about completing any assessments. *Id*. at 105.

{¶ 26} Ms. Chase testified that she provided T.B. with all the information she needed to complete the drug testing required by the case plan on three separate occasions between June and November of 2023, but T.B. did not contact the drug testing provider until

November 27, one week before trial. *Id*. at 106. T.B. "did start calling" the provider every day between then and December 2, as required, and completed two negative drug screens during that time. *Id*.

{¶ 27} T.B. expressed to Ms. Chase, as she had with Ms. Webb, that "transportation and needing bus passes" was a barrier to compliance with the case plan. *Id*. at 107. Although Ms. Chase had given T.B. a bus pass in July, Ms. Chase tried but was not able to give her one in August. In spite of multiple attempts to meet with T.B., she did not see her again until the day of trial, when she did give T.B. another bus pass. Ms. Chase made "three unannounced and announced visits in August," none of which resulted in visiting T.B. in her home. *Id*. at 121. After that, T.B. sent Ms. Chase a text message stating that she no longer wanted Ms. Chase to come her house.

{¶ 28} Ms. Chase also tried to address T.B.'s aversion to being drug tested through the provider that FCCS worked with because she feared that an employee there would falsify the results. Ms. Chase told T.B. that she could get tested at Columbus Public Health instead. T.B. "thanked" her for the information and stated "on numerous occasions" that she would follow up, but never provided Ms. Chase with any information or verification of her attempts. *Id*. at 108.

{¶ 29} Ms. Chase testified about her observations of T.B.'s visits with the children. At times, T.B. "was very consistent" with attendance, but at other times, she "would miss one, two, three visits in a row." *Id*. at 109. Even with missed visits, however, T.B. "would call in every time" to inform the visitation supervisor of her absence. *Id*. Because of T.B.'s non-attendance since September 2, she was removed from the visitation schedule on November 4, 2023. T.B. "did attempt to attend a visit on September 23rd," but the visit was cancelled because she arrived too late. *Id*. at 110. Ms. Chase reported that T.B. "appeared to be very appropriate at visits" that she observed, where T.B. at times brought food, crafts and toys for the children. *Id*. at 113. There were some "instances" where Ju.B. "felt very uncomfortable" with T.B. at visits, such as when she asked her to look at "pictures or videos" on her cellphone that caused that reaction. *Id*. In Ms. Chase's opinion, all three children appeared "to be very bonded to" T.B., and she to them. *Id*. at 113. She believed that Jo.B. and R.B. had "a stronger bond" with T.B. than Ju.B., who did "not wish to visit" T.B. *Id*. at 114. However, Ms. Chase stated that she knew that Ju.B. "loves her mom." *Id*.

{¶ 30} Ms. Chase also described her observations of the children in their respective foster homes. Of the three, she believed that Ju.B. had "the strongest bond with her foster mom," who was "a huge advocate" for her with regard to her mental health treatment. *Id.* at 114. In Ms. Chase's opinion, Ju.B. was "very comfortable in the foster home" and "very bonded with her foster mom." *Id.* Jo.B. was also "very bonded [with] her foster mom," and expressed her desire to remain there, where she felt safe and did not have "any issues or concerns." *Id.* at 115. R.B., too, was "bonded with her foster mom," who she referred to as mom. *Id.* R.B. informed Ms. Chase that she felt safe there, did not want to leave, and wanted to "remain" there. *Id.* Her foster mother had arranged for all three girls to be "on the same cheer team," allowing them all to "see each other." *Id.* The foster parents all knew and communicated with each other. *Id.* All three foster mothers wished to adopt the girls. *Id.* at 116.

{¶ 31} Ms. Chase described the children's special needs. Jo.B. had "some behavioral issues that cause[d] her to struggle in school," but was actually doing "really well" in the current school year because her foster mother helped her to get mental health treatment. *Id.* at 116-17. Ju.B. also had "mental health concerns" and her foster mother was pursuing treatment for her. *Id.* at 117.

{¶ 32} Ms. Chase received a phone call from their maternal grandmother shortly after being assigned to the case with the contact information for someone who "was interested in placement [of] the children for legal custody." *Id.* However, Ms. Chase "never heard back" after attempting contact. *Id.* The grandmother herself was "potentially interested in legal custody" of the youngest girls, but "her husband did not want the children in the home." *Id.* at 118. Ms. Chase also talked with T.B. "numerous" times to ask "if there were any family members that she wanted to explore" for placement of the children and asked T.B. to have any such family member contact her, but no one ever did. *Id.* at 117.

{¶ 33} When asked about the agency's recommendation, Ms. Chase responded that FCCS believed that a grant of permanent custody in its favor was "the best route to get permanency for these three children." *Id.* at 118.

{¶ 34} T.B. testified on her own behalf. When asked if she had completed the case plan, she responded: "Probably somewhat." (Dec. 5, 2023 Tr. at 9.) She stated that she had completed parenting classes and a mental health assessment, had stable housing and was

currently employed. T.B. testified that she lived alone in a "five-bedroom house" that included a "playroom," as well as furniture and clothes for the children. *Id.* at 10. She stated that she was a night manager at a McDonald's and the restaurant had allowed her to return to the position after being incarcerated.

{¶ 35} T.B. described her drug screening compliance as "here and there" but asserted that she was currently "consistent." *Id.* at 9-10. She stated that although she had previously completed a mental health assessment, she got "more help" while incarcerated and was about to begin treatment with Vivitrol, an injectable medication for opioid dependency, from a service provider. *Id.* at 13. She stated that she had received mental health counseling and submitted to drug testing at MKS Recovery in 2021 and 2022. She claimed to have signed "some" releases for records, including for those from MKS Recovery, but could not provide specifics. *Id.* at 17.

{¶ 36} T.B. testified that she had not visited with the children in the three months before trial, although she had seen Ju.B. on her birthday at the end of September. She described the earlier visits as "[g]ood," although there had been times a supervisor intervened, and she and Ju.B. had some conflict on her daughter's use of social media. *Id.* at 19-20. T.B. felt that she was bonded with the children, and they with her. *Id.* at 22.

{¶ 37} T.B. acknowledged that she was currently on a two-year term of probation for a fifth-degree felony conviction for theft. *Id.* at 42. She described the probation requirements as "the same" as those in the case plan, including random drug testing and mental health treatment. *Id.* at 23. She had completed her first random drug test for probation on the day she testified. *Id.* T.B. felt that she had "tried" to comply with the case plan and did not want her parental rights terminated. *Id.* at 26. She believed that she had "just turned a new leaf" was going to do what was necessary to comply with the requirements of probation. *Id.* She conceded that FCCS had told her in April 2023 that the agency could not accept services from MKS Recovery as compliant with the case plan.

{¶ 38} T.B. stated that she had last used oxycodone "around February 25th of 2022," before she had gone into labor with her youngest child. *Id.* at 34-35. She also stated that she had been sober "for a long time" and attended Narcotics Anonymous meetings on a daily basis. *Id.* T.B. admitted that she had not submitted to drug testing for FCCS until the last several weeks. *Id.* at 36.

{¶ 39} The final witness at trial was Crysta Pierson, the children's GAL. She testified that she was appointed to that role on January 10, 2023. She discussed each child in turn, beginning with Ju.B., who was 13 at the time of trial. Ms. Pierson testified that Ju.B. was old enough to understand the permanent custody proceedings and had "expressed a lot" about her wishes. *Id.* at 52. Ju.B. wanted to remain with her foster mother. To Ju.B., "it's a forever family and she said she wanted to be adopted." *Id.* The last time that Ms. Pierson had met with Ju.B., she said that she had not seen T.B. "in several months" and "she did not mention visiting in the future with" her. *Id.* Ju.B.'s wishes were "consistent" over time. *Id.* She openly discussed "past trauma or past experiences" from living with T.B. with Ms. Pierson and "was really concerned with mom's health and whether or not mom was using or abusing substances." *Id.* Ms. Pierson believed that Ju.B. "dearly loves her mother and wants the best for her mother," but she had not lived with her for five years and wanted to stay with her foster mother, with whom she was bonded and had "a good relationship." *Id.* at 53. Ms. Pierson also mentioned that Ju.B. had "bereavement and grief issues," but those were being addressed with counseling. *Id.* at 60.

{¶ 40} Ms. Pierson testified that Jo.B., who was "a very mature seven" at the time of trial, also understood the nature of the permanent custody proceedings. *Id.* at 55. Jo.B. also wanted to stay with her foster mother and be adopted by her. She had asked her foster mother how long the adoption process would take. Jo.B. had not spoken to T.B. and had not mentioned her to the foster mother "since October." *Id.* at 56. Ms. Pierson believed that Jo.B. had a bond with T.B., based on her observations of them together with T.B.'s baby. Ms. Pierson described Jo.B. as "very bonded" in her foster home and with her foster mother, and stated that her foster siblings were like Jo.B.'s "best friends." *Id.* at 57. Although Jo.B. had "talked a lot about her grandmother" toward the beginning of Ms. Pierson's observations and brought up the possibility of being adopted by her, "recently" she only mentioned being adopted by her foster mother. *Id.* Ms. Pierson opined that Jo.B. appeared "to do much better" in school since being prescribed Ritalin. *Id.* at 59-60.

{¶ 41} R.B., the youngest child, was five at the time of trial. Although Ms. Pierson didn't believe R.B. fully understood adoption, "she does know what forever means" and had stated that she wanted to stay with her foster mother, who she called mom. *Id.* at 57. Ms. Pierson was not sure if R.B. had "any significant memories from" living with T.B. or

remembered living with her. *Id.* at 58. Ms. Pierson did observe R.B. calling T.B. "mom" during visits and believed that R.B. knew that T.B. was her birth mother. *Id.* Ms. Pierson also described R.B. as bonded with her foster siblings as well as her birth siblings.

{¶ 42} Ms. Pierson testified that she believed all of the foster mothers would allow the girls to have contact with one another and that "they would allow contact with [T.B.] as well." *Id.* at 59.

{¶ 43} When Ms. Pierson was asked for her ultimate recommendation, she stated that her answer required "an explanation." *Id.* at 60. She acknowledged that T.B. had "a stable home" that was "suitable for her children," with beds, clothing, and "everything that the children would need." *Id.* Ms. Pierson also believed that T.B. was employed because she "talked to her when she was at work or walking into work," although Ms. Pierson had not seen any pay stubs. *Id.* However, because T.B.'s substance abuse was the reason for the children's removal, and because T.B. subsequently had had another child while using illicit substances, substance abuse was a major focus for Ms. Pierson. Ms. Pierson had talked to T.B. and attempted to get records from MKS Recovery, but they did not exist. Ms. Pierson acknowledged that T.B. had a recent negative drug test, but there was "not enough" in the record to demonstrate T.B.'s sobriety. *Id.* at 61. Ms. Pierson recommended granting the motion for permanent custody, emphasizing "the length of time" that the children had been in foster care, as well as the fact that in "the last few months they've had very little to no contact" with T.B. *Id.*

{¶ 44} On December 28, 2023, the trial court granted the motion for permanent custody in favor of FCCS, terminated T.B.'s parental rights, and ordered the agency to file an adoption case plan. T.B. has appealed and asserts the following assignment of error:

> The lower court's decision to terminate Mother's constitutional right to parent her three daughters Ju.B., Jo.B., and R.B. ran against the manifest weight of the evidence.

{¶ 45} Ms. Ullman has also appealed and asserts the following two assignments of error:

> I. The trial court erred by removing me as guardian ad litem.
>
> II. The trial court erred in determining that granting permanent custody to the agency is in the children's best interest without my testimony.

## II. Standard of Review

{¶ 46} The Supreme Court of Ohio had held that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11 (resolving conflict between Ohio appellate districts over the standard of review in appeals arising under R.C. 2151.414 and reversing district that had applied an abuse-of-discretion standard). In this case, a manifest-weight-of-the-evidence standard applies to the arguments raised. *E.g.*, *In re K.L.*, 2013-Ohio-3499, ¶ 13 (10th Dist.), citing *In re Andy-Jones*, 2004-Ohio-3312 (10th Dist.) (holding that a decision awarding permanent custody "will not be reversed on appeal unless it is against the manifest weight of the evidence").

{¶ 47} "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. Under this standard, the reviewing court "will not overturn a permanent custody order when it is supported by competent, credible evidence." *In re C.W.*, 2020-Ohio-1248, ¶ 51 (10th Dist.). The appellate court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 2015-Ohio-4682, ¶ 13 (10th Dist.). This deference stems from the recognition that, in comparison to the appellate court, the trial court "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

## III. Analysis

{¶ 48} We will consider T.B.'s assignment of error first, and then turn to Ms. Ullman's appeal.

### A. T.B.'s Assignment of Error

{¶ 49} Under R.C. 2151.414(B)(1), an agency that files a motion for permanent custody must show "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency," and, under the same evidentiary standard, that one of five factors stated in that statutory provision applies as well. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 50} The trial court determined that one factor under R.C. 2151.414(B)(1) was met. (Dec. 28, 2023 Decision & Jgmt. Entry at 6.) R.C. 2151.414(B)(1)(d) applies if "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," and no party contests this determination. The children in this case had been in temporary custody since March of 2019, over four years before trial.[2]

{¶ 51} The trial court also concluded that clear and convincing evidence demonstrated that it was in the children's best interest to grant the motion for permanent custody, as required by R.C. 2151.414(B)(1). The statute provides two separate methods for making the best interest determination. Under the first method, set forth in R.C. 2151.414(D)(1), "the court shall consider all relevant factors, including, but not limited to" five factors specifically described in R.C. 2151.414(D)(1)(a)—(e) to determine whether granting the motion for permanent custody is in the child's best interest. The second method provides that if the four factors under R.C. 2151.414(D)(2) "apply," the trial court *must* grant the motion because "permanent custody is in the best interest of the child" regardless of any other consideration. In this case, the trial court concluded that granting the motion for permanent custody was in the children's best interest under both provisions.

{¶ 52} The trial court began with a consideration of the R.C. 2151.414(D)(1) factors, the first of which asks the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home

---

[2] Under R.C. 2151.414(D)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). The trial court noted that the children were each "bonded" and "respond very well" to their foster mothers, who in turn "have always encouraged" T.B. "to remain involved in the children's lives" and helped her "maintain contact" with them. (Decision & Jgmt. Entry at 3.) The trial court acknowledged that T.B. had "for the most part, visited regularly" with them, although her "arguable, inappropriate behavior" had led to suspension of visitation, "most recently" in the months before trial. *Id.*

{¶ 53} The trial court also considered "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Ju.B. was "bonded" with [T.B.], "yet she wishes to remain in her foster home." (Decision & Jgmt. Entry at 3.) The trial court relied on the GAL's report, which stated that Ju.B. was old enough to understand adoption and did not want to return to live with T.B. The court also noted that Ju.B. had "bad experiences" that she remembered, and although she loved her mother, she understood T.B.'s "inability to maintain a stable, drug-free lifestyle and her inconsistent ability to care for her and her siblings." *Id.*

{¶ 54} The trial court also described Jo.B. as "bonded with her mother," but, at the age of seven, had "never stated that she wanted to live with T.B." Jo.B. had "changed her mind over the years" about living with her grandmother and, shortly before trial, had told the GAL that she wanted her "current home to be her forever home." *Id.* The trial court found that although she was young, Jo.B. understood adoption, noting the example of a recent adoption in her foster home.

{¶ 55} R.B., at the age of five, was "too young to express her opinion regarding adoption." *Id.* She had "no memory" of living with T.B., only her foster mother, with whom "she wants to live with forever and whom she identifies as her mom." *Id.* R.B. still wanted to visit T.B. but did not want to spend the night with her.

{¶ 56} The trial court also considered "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," as stated under R.C. 2151.414(D)(1)(c). After recounting the custody orders issued during the pendency of the case, the trial court noted that the children

had remained "in the care of FCCS continuously for 56 months (four years and eight months)." *Id.*

{¶ 57} When assessing the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency" under R.C. 2151.414(D)(1)(d), the trial court discussed the case plan FCCS had developed and the evidence demonstrating that T.B. had "failed to remedy the barriers to reunification." *Id.* at 4. The trial court acknowledged that T.B. had obtained and maintained stable housing. However, although she "consistently stated" that she had been employed, she had "failed to sign releases of information or give evidence of her employment and income." *Id.* The trial court also could not conclude that T.B. had complied with the requirement to complete a mental health assessment and follow any given recommendations, in spite of caseworkers' referrals. While noting that the same requirement recently arose due to her felony conviction, prompting her to testify of her intent to comply, "she had made these promises before and failed to follow through." *Id.* T.B. had "never provided any verification" of her attendance at a parenting class. *Id.* She had "failed to maintain consistent contact with FCCS" and "signed a few but not most of the releases" the agency required. *Id.* at 5. In spite of her assertions that she had "completed multiple drug tests," they could not be verified because of her refusal to sign releases. *Id.* In addition, she had "tested positive for multiple illegal substances" when she gave birth to her youngest child. *Id.* T.B. had not completed the case plan objectives or remedied "the issues that initially caused the children to be placed outside the home." *Id.*

{¶ 58} T.B. argues that the trial court erred when it concluded, based on its consideration of the R.C. 2151.414(D)(1) factors, that it was in the children's best interest to grant the motion for permanent custody. Citing to a number of statements by Ms. Ullman, she asserts that "evidence presented by the first GAL indicated the children preferred to not be removed from" T.B. (Brief of Appellant at 35.) However, most of the statements she cites to are from 2019 or 2020, years before the trial, or even older, such as Ms. Ullman's November 28, 2018 report. The fact that the older girls at that time expressed a desire to remain with their mother is understandable. However, their wishes changed, as the testimony at trial demonstrated.

{¶ 59} T.B. also cites to the "final report" Ms. Ullman filed as a GAL on January 9, 2023, and points out that Ms. Ullman "recommended the children be returned" to her. *Id.* The trial court was entirely justified in disregarding that report. Ms. Ullman filed the report *after* her dismissal as GAL by the first judge. Thus, it is incorrect to refer to the filing as a GAL report. The filing itself does repeat Ms. Ullman's recommendation that the children be returned to T.B. (Jan. 9, 2023 Supp. Report at 2.) However, part of the issue at the hearing earlier that day was that "none of the reports" filed by Ms. Ullman "explicitly [made] a recommendation" on the permanent custody motion. (Jan. 9, 2023 Tr. at 7.) In her January 4, 2023 report, for example, she stated that she was "hesitant to make any recommendation prior to trial." (Jan. 4, 2023 Supp. Report at 3.) At the hearing five days later, Ms. Ullman initially refused to give any recommendation at all and only after a contentious exchange with the judge did she finally state that "[g]o back to mom" was her recommendation. (Jan. 9, 2023 Tr. at 24.) She said nothing more to explain her reasoning. Nor is there any explanation of the reasoning for this recommendation in Ms. Ullman's filing, which was not based on any interaction that she had with the children, as she had refused to visit them in their foster homes. Although this filing was captioned "Supplemental Report of the Guardian ad Litem," its purpose was made explicit in its first sentence: "This report is being filed to warn any future guardian of the improper actions taken by [the judge] and FCCS against me in my role as guardian." (Jan. 9, 2023 Supp. Report at 1.) The trial court did not err by not taking this document into consideration and instead relying on the recommendation of Ms. Ullman's replacement, who testified at trial after meeting with the children and preparing a report with her recommendation.

{¶ 60} T.B. also argues that the custodial history of the children, the R.C. 2151.414(D)(1)(c) factor, should not have weighed against her, asserting that "the separation between herself and her children did not diminish their desire to be reunited with her." (Brief of Appellant at 36.) As discussed, the evidence at trial contradicts this assertion.

{¶ 61} T.B. asserts as well that she is best suited to provide permanency for the children because she "proved" her "substantial compliance with the case plan" at trial. *Id.* 36-37. Again, this statement is at odds with the trial court's findings. The trial court repeatedly described the lack of evidence in the record relevant to case plan compliance.

T.B. had "failed to produce proof of her employment or income" and her refusal to sign releases made it impossible for caseworkers or the GAL "to verify her drug usage or lack thereof." (Decision & Jgmt. Entry at 4-5.) In the end, the trial court concluded that T.B. had "failed to complete any of her case plan objectives or otherwise remedy the issues that initially caused the children to be placed outside the home." *Id.* While this statement overlooks T.B.'s compliance with the directive to maintain stable housing, it is an otherwise accurate reflection of her progress, as demonstrated by record evidence, which fell far short of substantial compliance with the case plan's goals.

{¶ 62} Even if T.B. had complied with the case plan more substantially, however, "substantial compliance with a case plan is not, in and of itself, 'dispositive' and 'does not preclude a grant of permanent custody to a social services agency.'" *In re G.M.*, 2024-Ohio-5398, ¶ 27 (10th Dist.), quoting *In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.). "The issue is whether parents have substantially remedied the conditions that caused the child to be removed from the home." *Id.* In this case, that issue was T.B.'s substance abuse problem. The trial court did not find T.B.'s assertions of sobriety credible, and her sporadic efforts to comply with the drug screens failed to produce corroborating evidence of sobriety. The trial court did not err when it concluded that T.B. had not addressed her substance abuse problem, and, therefore, had not remedied the situation that caused her children's removal.

{¶ 63} After our review of the record relied upon by the trial court, including the testimony of both caseworkers, the GAL, and T.B., we conclude that the manifest weight of the evidence supported the trial court's determination that granting the motion for permanent custody was in the children's best interest under the R.C. 2151.414(D)(1) factors.

{¶ 64} The trial court also conducted the alternative best interest analysis under R.C. 2151.414(D)(2), but we decline to review it for several reasons. First, as FCCS notes in its brief, its motion did not seek to prove that permanent custody was in the children's best interest under that provision. Rather, FCCS invoked only R.C. 2151.414(D)(1). Second, having affirmed the trial court's ruling under the latter provision, any error under R.C. 2151.414(D)(2) would be harmless. *See, e.g., In re J.C.*, 2024-Ohio-5107, ¶ 34 (10th Dist.), fn. 5 (declining to address appellant's "alternative argument" under R.C. 2151.414(D)(2) where "the trial court's findings under (D)(1)(a) through (e) were met and not against the manifest weight of the evidence"). Finally, T.B.'s argument addressing the trial court's R.C.

2151.414(D)(2) is duplicative of her argument that she substantially complied with the case plan, which we have already considered and rejected. For the foregoing reasons, T.B.'s sole assignment of error is overruled.

### B. Ms. Ullman's Appeal

{¶ 65} Ms. Ullman has appealed both the trial court's order removing her as guardian ad litem and its decision granting permanent custody in favor of FCCS. The latter issue is moot, as we have affirmed the trial court's decision. Accordingly, Ms. Ullman's second assignment of error is overruled as moot.

{¶ 66} R.C. 2151.281(D) states: "The court shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem." Furthermore, R.C. 2151.281(I) provides:

> The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

{¶ 67} In *In re C.J.*, 2019-Ohio-1863 (10th Dist.), we dismissed a GAL's interlocutory appeal from an order removing him after "a magistrate found the GAL's actions created the appearance of losing his objectivity, fairness, and independence, concluding it was not taken from a final appeal order. *In re C.J.* at ¶ 23. We dismissed the appeal after concluding that the GAL had not appealed from a final appealable order. We reasoned that "a GAL that has been removed during a [permanent custody] matter has a recourse in the appellate courts; however, that recourse is an appeal after final judgment on the underlying" motion for permanent custody. *Id.* at ¶ 35. Therefore, a direct appeal following final judgment was the proper course in this case.

{¶ 68} Here, Ms. Ullman's brief does not identify any reversible error in the trial court's decision granting the motion for permanent custody that occurred because of her removal. *See id.* Nor does she describe any remedy that this court can provide concerning

her dismissal. She asks that "[t]his case . . . be reversed and remanded for a new trial," but our affirmance of the trial court's grant of permanent custody precludes any such relief. (Brief of Appellant GAL at 27.) Ms. Ullman's brief, which cites to no part of the record developed at trial, fails to demonstrate how her removal negatively affected those proceedings. She merely states that her "testimony regarding the agency's obstructionist behavior and its impact on [the children] would be a relevant factor that could have altered the outcome" of the trial. *Id.* at 26. This assertion is speculative. Ms. Ullman fails to explain how such accusations would have been relevant to its analysis, much less determinative of the outcome. The remainder of her brief is almost entirely devoid of legal argument and is mainly concerned with attacking the integrity of the trial court and FCCS. We decline to address those arguments.

{¶ 69} In short, Ms. Ullman has produced no cognizable grounds for appealing her removal, and her first assignment of error is therefore overruled. Even if there were grounds for reviewing her removal, however, Ms. Ullman admitted to the trial court that she did not want to provide the recommendation required of her role. The first of a GAL's general responsibilities is to "[p]rovide the court recommendations of the best interest of the child." Sup.R. 48.03(A)(1). *See also In re D.E.*, 2021-Ohio-524, ¶ 92 (10th Dist.) (stating that "the duty of the GAL is to provide the court with information and recommendations regarding the children's best interest"). Ms. Ullman wished to delay her recommendation until after hearing testimony at trial, a course of conduct that this court has recognized as reversible error. *See In re A.S.*, 2022-Ohio-1861, ¶ 70 (10th Dist.) (holding that GAL "failed to perform his required duties in significant ways," in part by "basing his opinion at the permanent custody hearing in part on testimony he heard at the hearing itself" in derogation of a GAL's duty to provide the court with "independent assessments").

{¶ 70} Furthermore, the "duties of a guardian ad litem" include, among other duties, the following: "Observe the child with each parent, foster parent, guardian or physical custodian" and "Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court." Sup.R. 48.03(D)(2) and (4). Ms. Ullman admits in her brief that she "did not see the girls with their foster placements," blaming "COVID and hostility from those placements or failure of FCCS to inform [her] of

them." (Brief of Appellant GAL at 25.) For these reasons, even if we were to review the trial court's decision, Ms. Ullman's admissions undermine the assertion that her removal was improper. Her two assignments of error are overruled.

## IV. Conclusion

{¶ 71} Having overruled all assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Division.

*Judgments affirmed.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.

_____